IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
SECOND JUDICIAL DISTRICT

WILLIAM PATE, KRISTINA PATE, AND
LANDON PATE, A MINOR,
BY AND THROUGH HIS NATURAL
GUARDIANS, WILLIAM AND KRISTINA PATE

**PLAINTIFFS**

CAUSE NO. A2402-2017-157

VERSUS

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z

**DEFENDANTS**

### SUMMONS

THE STATE OF MISSISSIPPI
COUNTY OF HARRISON

TO:  Forest City Residential Management, LLC
c/o Registered Agent
FCE Statutory Agent, Inc.
50 Public Square, Suite 1360
Cleveland, Ohio 44113
OR WHEREEVER THEY MAY BE FOUND

### NOTICE TO DEFENDANT(S)

**THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.**

You are required to mail or hand-deliver a copy of a written response to the Complaint to **Rushing & Guice, P. L. L. C.**, the attorneys for Plaintiffs, whose address is **Post Office Box 1925, Biloxi, Mississippi 39533-1925** and whose street address is **1000 Government Street, Suite E, 2nd Floor, Ocean Springs, Mississippi 39564.** Your response must be mailed or delivered within thirty (30) days from the date of delivery of this Summons and Complaint or a Judgment by default will be entered against you for the money or other things demanded in the Complaint.

You must also file the original of your response with the Clerk of this Court within a reasonable time afterward.

Issued under my hand and the seal of said Court, on this the 22 day of December, 2017.

(SEAL)

Connie Ladner _____ Clerk

BY: _____ D.C.

EXHIBIT
B

## RETURN

**STATE OF** _____

**COUNTY OF** _____

[ ]   I served this Summons on the ____ day of _____, 201__, by handing a true copy of the Summons and Complaint to: _____.

[ ]   I was unable to find _____ within _____ County. I served this Summons on the _____ day of _____, 201 __, at the address of said _____, by handing a true copy of the Summons and Complaint to: _____ who is an agent of the above listed.

[ ]   CERTIFIED MAIL SERVICE. By mailing to an address outside Mississippi (by first class mail, postage prepaid, requiring a return receipt) copies to the person served. (Signed return receipt attached or the return envelope marked "Refused.")

[ ]   FIRST CLASS MAIL AND ACKNOWLEDGMENT SERVICE. By mailing (by first class mail, postage prepaid), on the date stated in the attached Notice, copies to the person served, together with copies of the form of notice and acknowledgment and return envelope, postage prepaid, addresses to the sender (Attach completed acknowledgment of receipt pursuant to M.R.C.P. Form 1B).

This _____ day of _____, 201__.

_____
Sheriff or Process Server

Fees For Service: $_____

_____
Deputy Sheriff

Process Server's Address   _____
and Telephone Number:      _____
                           _____

**STATE OF** _____

**COUNTY OF** _____

PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the state and county aforesaid, the

within named _____, who being first by me duly sworn states under oath that the matters

and facts set forth in the foregoing Return on Summons are true and correct as therein stated.

SWORN TO and SUBSCRIBED before me, this the _____ day of _____, 201__.

_____
**NOTARY PUBLIC**

My Commission Expires

-2-

**IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI**
**SECOND JUDICIAL DISTRICT**

WILLIAM PATE, KRISTINA PATE, AND
LANDON PATE, A MINOR,
BY AND THROUGH HIS NATURAL
GUARDIANS, WILLIAM AND KRISTINA PATE                    **PLAINTIFFS**

                                                    CAUSE NO. A2402-2017-157

**VERSUS**

HUNT SOUTHERN GROUP, LLC FKA
FOREST CITY SOUTHERN GROUP, LLC,
FOREST CITY RESIDENTIAL MANAGEMENT, LLC,
HUNT MH PROPERTY MANAGEMENT, LLC,
UNKNOWN JOHN AND JANE DOES A THROUGH M, AND
OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z        **DEFENDANTS**

### SUMMONS

THE STATE OF MISSISSIPPI
COUNTY OF HARRISON

**TO:**    Forest City Residential Management, LLC
        c/o Registered Agent
        FCE Statutory Agent, Inc.
        50 Public Square, Suite 1360
        Cleveland, Ohio 44113
        **OR WHEREEVER THEY MAY BE FOUND**

### NOTICE TO DEFENDANT(S)

**THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU
MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS.**

    You are required to mail or hand-deliver a copy of a written response to the Complaint to **Rushing
& Guice, P. L. L. C.**, the attorneys for Plaintiffs, whose address is **Post Office Box 1925, Biloxi,
Mississippi 39533-1925** and whose street address is **1000 Government Street, Suite E, 2nd Floor, Ocean
Springs, Mississippi 39564**.  Your response must be mailed or delivered within thirty (30) days from the
date of delivery of this Summons and Complaint or a Judgment by default will be entered against you for
the money or other things demanded in the Complaint.

    You must also file the original of your response with the Clerk of this Court within a reasonable
time afterward.

    Issued under my hand and the seal of said Court, on this the 22 day of December, 2017.

Connie Ladner _____Clerk

BY: _____D.C.

## IN THE CIRCUIT COURT OF HARRISON COUNTY, MISSISSIPPI
### SECOND JUDICIAL DISTRICT

**WILLIAM PATE, KRISTINA PATE AND**
**LANDON PATE, A MINOR,**
**BY AND THROUGH HIS NATURAL**
**GUARDIANS, WILLIAM PATE AND KRISTINA PATE**      **PLAINTIFFS**

**VERSUS**                                           CAUSE NO. A2402-2017-157

**HUNT SOUTHERN GROUP, LLC FKA**
**FOREST CITY SOUTHERN GROUP, LLC,**
**FOREST CITY RESIDENTIAL MANAGEMENT, LLC,**
**HUNT MH PROPERTY MANAGEMENT, LLC,**
**UNKNOWN JOHN AND JANE DOES A THROUGH M, AND**
**OTHER UNKNOWN CORPORATE ENTITIES N THROUGH Z**      **DEFENDANTS**

### COMPLAINT

### JURY TRIAL REQUESTED

COME NOW Plaintiffs, William Pate, Kristina Pate and Landon Pate, a minor, by and through his natural guardians, William Pate and Kristina Pate (Plaintiffs), by and through their attorneys, Rushing & Guice, P.L.L.C., and file this their Complaint against Hunt Southern Group, LLC fka Forest City Southern Group, LLC, Forest City Residential Management, LLC, Hunt MH Property Management, LLC, Unknown John and Jane Does A through M, and Other Unknown Corporate Entities N through Z (Defendants), and for good cause of action, states unto the Court the following, to-wit:

### PARTIES

1.

Plaintiff, William Pate ("William"), is an adult citizen of Harrison County, Mississippi residing at 226 Fairchild Drive, Biloxi, Mississippi.



FILED
DEC 22 2017
CONNIE LADNER
CIRCUIT CLERK
BY:_____D.C.

2.

Plaintiff, Kristina Pate ("Kristina"), is an adult citizen of Harrison County, Mississippi residing at 226 Fairchild Drive, Biloxi, Mississippi.

3.

Plaintiff, Landon Pate ("Landon"), is the minor child of William and Kristina, his natural guardians, born February 21, 2006, and is a resident of the State of Mississippi residing at 226 Fairchild Drive, Biloxi, Mississippi.

4.

Defendant, Hunt Southern Group, LLC (Hunt Southern), formerly known as Forest City Southern Group, LLC (Forest City Southern) is a Delaware Limited Liability Company registered to do business in Mississippi. On March 18, 2016, Forest City Southern Group, LLC filed Articles/Certificate of Amendment with the Mississippi Secretary of State, changing its name to Hunt Southern Group, LLC. Hunt Southern fka Forest City Southern may be served through it registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840, Jackson, Mississippi 39201. Hunt Southern fka Forest City Southern is believed to be the owner of the property in issue.

5.

Defendant, Forest City Residential Management, LLC (Forest City Residential Management), is an Ohio Limited Liability Company, formally known as Forest City Residential Management, Inc., whose registration in Mississippi was administratively dissolved on November 30, 2016. Forest City Residential Management may be served with process by serving its registered agent for process, FCE Statutory Agent, Inc., 50 Public Square, Suite 1360,

Cleveland, Ohio 44113. Forest City Residential Management is listed as the agent for Forest City

Southern Group on the lease for the property in issue.

6.

Defendant, Hunt MH Property Management, LLC (Hunt MH Property Management), is a

Delaware Limited Liability Company, registered to do business in Mississippi and may be served

through its registered agent, Capitol Corporate Services, Inc., at 248 E. Capitol Street, Suite 840,

Jackson, Mississippi 39201. Based on information and belief, Hunt MH Property Management is

the agent of Hunt Southern and has been charged with the maintenance and upkeep of the

property in issue.

7.

Other Unknown John and Jane Does A through M are unknown Defendants who may be

seasonably supplemented after discovery.

8.

Other Unknown Corporate Entities N through Z are unknown Defendants who may be

seasonably supplemented after discovery.

**JURISDICTION AND VENUE**

9.

Jurisdiction is proper in this Court under Miss. Code Ann. § 9-7-81. Venue is proper in

Harrison County as this is the location where the injuries were sustained, where the cause of

action accrued and where Plaintiffs reside. Jurisdiction is also proper pursuant to Miss. Code

Ann. § 13-3-57 since Defendants were doing business within the State, made contracts with

Plaintiffs, who are residents of Mississippi, those contracts were performed wholly within

Harrison County, Mississippi, Second Judicial District, and the alleged tort was committed

against Plaintiffs in Mississippi. Defendants, therefore, should be subjected to the jurisdiction of Mississippi courts.

## FACTS

### 10.

William is a Petty Officer First Class in the United States Coast Guard. In September of 2015 after receiving a routine change of station to Pascagoula, Mississippi, William moved his family to Mississippi. Because the Coast Guard does not maintain housing in Pascagoula, Mississippi, Plaintiffs sought housing through Keesler Air Force Base. Like other military families moving to the area, the military housing assignment for Plaintiffs was controlled by Defendant Hunt Southern fka Forest City Southern.

### 11.

On August 25, 2015 Plaintiffs entered into a Military Lease Agreement for military housing in West Falcon Park Neighborhood located at 226 Fairchild Drive, Biloxi, Mississippi in the County of Harrison (Subject Property). See Military Lease Agreement attached hereto as **Exhibit "A."** Plaintiffs moved into the Subject Property in September of 2015. The Subject Property is located in the West Falcon Park Neighborhood, which is military housing specifically for Junior Enlisted (E1-E6). West Falcon Park is comprised of approximately 140 homes and is located near Keesler Air Force Base. At all times mentioned herein, the Subject Property was owned, controlled or managed by Defendants.

### 12.

At the time Plaintiffs entered into the Military Lease Agreement, West Falcon Park was owned and operated by Forest City Southern and managed through Forest City Residential Management. In 2016, West Falcon Park was acquired by Hunt Southern and was operated or

managed through Hunt MH Property Management. Upon information and belief Forest City Southern and Hunt Southern exercised custody and control over West Falcon Park and acted as the owners of West Falcon Park through a fifty year lease initiated by the United States Department of Defense through a program called the Military Housing Privatization Initiative. Essentially, while Defendants own the improvements on the land and maintain custody and control of the property, the United States maintains an ownership interest in the land.

13.

While residing in the Subject Property, Plaintiffs repeatedly reported maintenance concerns involving mold and water damage. Despite Defendants' maintenance technicians reporting that the mold and leaks were resolved, it was learned that the air conditioner ductwork had a sweating problem and that the mold problem was more pervasive. This duct sweating, caused by poorly insulated ductwork, contributed to the mold and water damage throughout the house. Further it has been recently shown that Defendants have taken significant steps to replace the ductwork in many of the houses they operate.

14.

Plaintiffs repeatedly requested that Defendants address mold and leaking problems while they lived in the Subject Property. Rather than addressing the cause of the leaks, Defendants' maintenance technicians cleaned the mold with soap and water. This allowed for the toxic mold to continue flourishing beneath the surface. Although Defendants learned that condensation coming from attic ductwork, nothing was done to repair the moisture problem.

15.

Fraudulent misrepresentations were made to Plaintiffs by Defendants regarding the removal of the mold. Plaintiffs were told that the mold problem had been rectified when in fact

the cause of the water damage was not addressed. Throughout the entire time Plaintiffs resided in the Subject Property, Defendants never replaced the air conditioner filters. Plaintiffs replaced the filters on their own.

16.

As a result of Plaintiffs' concerns, on April 20, 2017 testing was performed on the Subject Property with Mold Test USA. Mold Test USA performed a 52 Point Visual Inspection and tested both outside and inside the Subject Property for mold spores. The reports showed high levels of Aspergillus inside the Subject Property with more being found on the Subject Property's front porch.  These elevated levels of toxic mold are well-known for causing serious health concerns. See Mold Test USA Mold Reports attached hereto as **Exhibits "B and C."**

17.

After receiving Mold Test USA Mold Reports Plaintiffs requested that Defendants clean the air conditioning system in the Subject Property. In May of 2017, Defendants visited the Subject Property and took more photos of the mold. This time they also sprayed the mold with soap and water and then covered it with spray paint. Defendants also checked the attic and found that it was very humid and found a leaky pipe above the master bedroom. Despite additional maintenance visits, the mold was never properly remediated.

18.

Plaintiffs have obtained information from other military housing families leading them to believe that mold issues such as those experienced in their home were commonplace, having occurred in other military housing owned and operated by Defendants including others in West Falcon Park.

19.

As a direct result of the continued exposure to toxic mold located in Plaintiffs' home, all of which was known to Defendants, Plaintiffs have suffered and continue to suffer physical injuries, medical expenses and property damage. Plaintiffs have suffered property loss due to the mold contamination without having been compensated for any of their losses.

20.

The Subject Property is a water damaged building, a residential structure which has been subject to excessive water intrusion from both external and internal water leaks and moisture accumulation. The term "water damaged building" is also used in conjunction with a descriptive term now used by the National Academies of Science, the U.S. Centers for Disease Control, and the World Health Organization, i.e., "damp indoor spaces" and "mold related illness," all of which collectively describe a mixture of biologically generated contaminates known to cause adverse human health effects. Damp Indoor Spaces are now recognized by multiple federal and medical authorities as a public-health problem, contributing to tens of thousands of illnesses across the country and billions of dollars in medical costs.

21.

In this case, Plaintiffs had a certified mold investigator identify excessive mold growth and moisture inside the house, typical of a damp indoor space, both by sampling and visual observation. Aspergillus, known to be a powerful respiratory irritant, was found in the home during the air test. This spore is particularly dangerous, as it is well known to grow in excessive numbers in damp indoor spaces and to release mycotoxins and VOCs, and have toxic impacts of its own. The tests exceeded all bounds of sampling error and demonstrate the extremely dangerous conditions Plaintiffs are forced to live in.

22.

Defendants, as large, national managers and owners of thousands of apartment and residential units knew full well of the health risks associated with water damaged buildings and mold. Defendants failed to remediate mold in the Subject Property and caused serious injury and property loss to Plaintiffs as a result.

## COUNT I

## NEGLIGENCE

23.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 22.

24.

Defendants, as owners and/or managers of West Falcon Park:

A.     Failed to provide a reasonably safe premises in accordance with the Military Lease Agreement, which amounted to a breach of the implied warranty of habitability;

B.     Negligently failed to pay for relocation expenses;

C.     Failed to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by Plaintiffs;

D.     Negligently failed to maintain the air conditioning system and ducts in such a way allowing ideal conditions for toxic mold to grow in the Plaintiffs' house, including never replacing the air conditioner filters;

E.     Negligently managed and maintained West Falcon Park;

F.     Negligently supervised their employees, agents and/or representatives;

G.     Negligently trained and supervised their employees, agents and/or representatives;

H.    Negligently inspected West Falcon Park for dangerous and harmful conditions;

I.    Negligently remediated the toxic mold contained in the Subject Property;

J.    Knew or should have known that the house contained dangerous levels of toxic mold and did nothing to remedy the toxic mold infestation;

K.    Failed to exercise reasonable care to repair dangerous defective conditions, which included the existence of mass amounts of toxic mold in the Subject Property, upon notice of their existence by Plaintiffs;

L.    Negligently failed to promulgate warnings to their tenants about the existence of toxic mold and/or the possibility of the development of toxic mold; and

M.    Failed to prevent any and all other acts of negligence which may be proven at trial by failing to fulfill its duties to Plaintiffs, thus causing damages which they have suffered.

25.

As a direct and proximate result of the negligence of Defendants, Plaintiffs sustained serious and painful personal injuries, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

**COUNT II**

**GROSS NEGLIGENCE**

26.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 25.

27.

At all times mentioned herein, Defendants acted with gross negligence in total disregard of the duties owed to Plaintiffs to the degree that said gross negligence constitutes an intentional act.

28.

As a direct and proximate result of the gross negligence of Defendants, Plaintiffs have suffered injuries as described herein.

## COUNT III

## BREACH OF CONTRACT

29.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 28.

30.

Defendants breached the Military Lease Agreement entered into with Plaintiffs on August 25, 2015. The contract was breached for the following reasons:

A.     Defendants violated the Implied Covenant of Good Faith and Fair Dealing when they failed to deal fairly and in good faith causing Plaintiffs to not benefit from the contract;

B.     Defendants violated the Implied Warranty of Habitability, which is implied in all residential leases, when they leased to Plaintiffs a house that was not fit for human habitation;

C.     The negligent management and maintenance of the property led to the moist environment, which is ideal for toxic mold growth;

D.     Defendants failed to successfully complete the annual physical maintenance inspection of the property to ensure the house was up to housing maintenance quality standards by finding and repairing moist conditions that existed in the house;

E.     Defendants' employees or agents physically inspected the Subject Property after the complaints about toxic mold were made to Defendants and nothing was done to properly remedy the toxic mold infestation;

F.     Toxic mold spores were visible in plain sight so that Defendants' employees were able or should have been able to witness toxic mold growing in the houses and still did nothing to remedy the toxic mold infestation; and

G.     Defendants failed to honor the lease provision which allows for relocation of the tenant in the event the housing becomes uninhabitable. Further the lease provides that "Owner shall pay the cost of the relocation."

31.

As a direct and proximate result of Defendants' breaching the contract with Plaintiffs and providing an unreasonably dangerous house, Plaintiffs sustained serious and painful, extreme mental and physical pain and suffering, anxiety, anguish and upset, losses and damage to their quality of life, and mental and emotional well-being, property damage, and reasonable and necessary doctor, hospital, medical and related bills and expenses.

## COUNT IV

## CIVIL CONSPIRACY

### 32.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 31.

### 33.

At all times mentioned herein, Defendants operated under an agreement between two or more persons or entities to accomplish the unlawful purpose of concealing dangerous conditions within the Subject Property. Additionally, each Defendant committed overt acts in furtherance of this conspiracy to conceal the dangerous condition causing damage to Plaintiffs.

## COUNT V

## ALTER EGO

### 34.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 33.

### 35.

At all times mentioned herein, Defendants, and each of them, inclusive of Unknown John and Jane Does A through M and Unknown Entities N through Z, were authorized and empowered by each other to act, and did so act, as agents of each other, and all of the things herein alleged to have been done by them were done in the capacity of such agency. Defendants disregarded corporate formalities and used the corporate form to commit the aforementioned malfeasance. Upon information and belief, all Defendants are responsible in some manner for the events described herein and liable to Plaintiffs for the damages they have incurred.

## COUNT VI

## FRAUDULENT CONCEALMENT

36.

Plaintiffs incorporate herein each and every allegation contained in Paragraphs 1 through 35.

37.

Defendants are guilty of fraudulent concealment which, in accordance with Miss. Code §15-1-67, results in Plaintiffs' cause of action accruing when "such fraud shall be, or with reasonable diligence might have been, first known or discovered." The fraudulent actions of Defendants are:

A.      Defendants took affirmative action designed or intended to prevent Plaintiffs from discovering the presence of toxic mold in their home, which affirmative action did in fact work to prevent them from discovering the toxic mold, until such time as action was taken by Plaintiffs to confirm the presence of the toxic mold;

B.      Defendants' maintenance technicians repeatedly reported that the toxic mold and leaks were located, repaired and removed when in fact they were not;

C.      Defendants did not disclose to Plaintiffs that they knew that toxic mold was a problem in the military housing they owned and managed;

D.      Defendants did not disclose to Plaintiffs that they knew that toxic mold had caused serious health problem to residents of military housing they owned and managed; and

E.      Defendants did not disclose to Plaintiffs that they knew the military housing they owned and managed suffered from serious construction defects that caused damp indoor spaces making the growth of toxic mold foreseeable.

## COUNT VII

## INTENTIONAL ENDANGERMENT

38.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 37.

39.

At all times mentioned herein, Defendants' actions were intentional and endangering to Plaintiffs. This included intentionally endangering Plaintiffs by allowing them to live in dangerous housing conditions, intentionally endangering Plaintiffs by allowing the dangerous conditions to persist, intentionally endangering Plaintiffs by failing to remedy the dangerous conditions, and intentionally endangering Plaintiffs by failing to relocate Plaintiffs after the dangerous conditions were discovered.

## DISCOVERY RULE

40.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 39.

41.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the discovery rule. Plaintiffs suffered from a latent injury, undiscoverable by reasonable means. Plaintiffs neither knew nor should have known that they had been harmed, much less that their harm was caused by the wrongful conduct of Defendants until such time that was within the limitations period applicable to the claims they have asserted.

## CONTINUING TORT

42.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 41.

43.

To the extent that Defendants allege that any of Plaintiffs' claims against them are barred by any statute of limitations, Plaintiffs plead the continuing tort doctrine. Defendants inflicted injury upon Plaintiffs over a period of time by engaging in continuous wrongful conduct which has continued while Plaintiffs continue to live in the Subject Property.

## DISABILITY OF INFANCY

44.

Plaintiffs incorporate herein the allegations contained in Paragraphs 1 through 43.

45.

Landon Pate is a minor, tolling the applicable statute of limitations in accordance with the minors savings clause. See Miss. Code Ann. § 15-1-59.

## DAMAGES

46.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 45.

47.

As a direct and proximate result of the Defendants' wrongful and negligent conduct, Plaintiffs sustained serious injuries, losses, and damages as follows:

A. Plaintiff, William Pate, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and

necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for;

B. Plaintiff, Kristina Pate, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to her quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which she should be compensated for;

C. Plaintiff, Landon Pate, sustained serious and painful personal injuries, property damage, extreme mental and physical pain, suffering, anxiety, anguish and upset, losses and damage to his quality of life, and mental and emotional well-being, reasonable and necessary doctor, hospital, medical and related bills and expenses, all of which he should be compensated for.

## PUNITIVE DAMAGES

### 48.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 47.

### 49.

At all times mentioned herein, Defendants acted with actual malice and/or gross negligence which evidenced a willful, wanton, or reckless disregard for others, or committed actual fraud, and such actions were so oppressive and overbearing that in order to punish the wrongdoer and deter similar misconduct in the future, Defendants should be subject to punitive damages consistent with the statutory scheme in the State of Mississippi. Specifically, after considering Defendants' financial condition and net worth, the nature and reprehensibility of Defendants' wrongdoing, Defendants' awareness of the amount of harm being caused, and

Defendants' motivation in causing such harm, the duration of Defendants' misconduct and attempts to conceal such misconduct, and Miss. Code Ann. § 11-1-65, Defendants should be subject to punitive damages in an amount to be proven at trial and decided by the jury.

## ATTORNEYS' FEES

### 50.

Plaintiffs incorporate herein each and every allegation made in Paragraphs 1 through 49.

### 51.

Defendants are liable for all reasonable attorneys' fees, costs, and expenses incurred in pursuit of this cause if found liable for punitive damages or fraud.

## PRAYER

WHEREFORE, Plaintiffs pray that after due proceedings are had that a Judgment be rendered in favor of Plaintiffs and against Defendants for damages in an amount to be proven at the trial of this cause, said damages including actual damages, compensatory damages and any other such damages to which Plaintiffs may be entitled and which may be proven at the trial of this cause, for a punitive damages amount based on Defendants' financial condition and net worth, for attorneys' fees, for post-judgment interest, or for such other amount consistent with the statutory scheme in Mississippi for the awarding of such damages, for all costs of this cause and for such other relief to which Plaintiffs may be entitled under the premises.

Respectfully submitted,

**WILLIAM PATE, KRISTINA PATE AND
LANDON PATE, A MINOR, BY AND
THROUGH HIS NATURAL GUARDIANS,
WILLIAM PATE AND KRISTINA PATE
PLAINTIFFS**

BY:

**WILLIAM LEE GUICE III
MS BAR # 5059
MARIA MARTINEZ
MS BAR # 9951
RUSHING & GUICE, P.L.L.C.
P. O. BOX 1925
BILOXI, MS  39533
TELEPHONE: (228) 374-2313
FAX:  (228) 875-5987
ATTORNEYS FOR PLAINTIFFS**

Installation: <u>Keesler Air Force Base</u>
Forest City Southern Group, LLC
Neighborhood Management Office
300 Patrick Drive
Biloxi, MS 39531
Harrison County
(228) 374-5336

## MILITARY LEASE AGREEMENT

| | | | |
|---|---|---|---|
| 1. Lease Agreement Date: | August 26, 2015 | 6. Premises Address: | 0226FAIR |
| 2. Resident(s) | m0086526   Pay Grade: | 226 Fairchild Dr <br> Biloxi, MS  39531 | |
| William X Pate | E06 | 7. Monthly Rent: | $1,266.00 |
| | | 8. Partial Month Rent: | 0.00 |
| | | 9. Partial Month Rent Due Date: | September 1, 2015 |
| 3. Other Occupants: | | 10. Security Deposit: | 0.00 |
| Kristina Pate | | 11. Late Charge: $50.00 as specified in Paragraph 5 | |
| Landon Pate | | 12. Returned Check: $35 as specified in Paragraph 5 | |

4. Lease Term:
    a. Commencement Date:     August 26, 2015
    b. Expiration Date:     August 31, 2016

5. Neighborhood:     West Falcon Park

Resident agrees to pay Rent to Owner by monthly electronic Allotment.  Resident authorizes the Allotment to be initiated and changed as set forth in Paragraph 4 of this Lease Agreement.  Authorization is also given to stop the Allotment at the time that the Lease Agreement is terminated.

This Lease Agreement is a legally binding contract.  Owner and Resident agree that this Lease Agreement and the contractual relationship between the parties shall be construed in accordance with and shall be governed by the laws of the State of Mississippi and County of Harrison, except to the extent those laws may conflict with federal laws or regulations.

Owner and Resident accept the terms and conditions of the Lease Agreement.  The Lease Agreement includes this Lease Agreement, the Community Handbook and any addenda, and sets forth all promises, agreements, and understandings between Owner and Resident. The terms and conditions of this Lease Agreement may only be changed if in writing and signed by both Owner and Resident.   Oral changes or agreements are not permitted.

Forest City Residential Management, Inc., Agent for Owner, Forest City Southern Group, LLC.

By Authorized Representative: _____     8/25/15
                                                William X Pate IV                            Date

Resident: KPcd PoA   8/25/15       Resident: KPoA     8/25/15
                        Date                                            Date

**Addenda:**

| | | | |
|---|---|---|---|
| ☐ | Community Handbook | ☐ | Other: |
| | Dated <u>09/11</u> | ☐ | Other: |
| ☐ | Mold Addendum | ☐ | Other: |
| ☐ | Third Party Allotment Addendum | ☐ | Other: |
| ☐ | Pet Addendum | ☐ | Other: |
| ☐ | Current Resident Addendum | | |

EQUAL HOUSING OPPORTUNITY



EXHIBIT
A

# RENT IN ARREARS ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _8-26·15_
(the "Lease Signature Date") between Forest City Southern Group, LLC ("Owner") and
_William Pate_ ("Resident") regarding property located at
_226 Fairchild_ (the "Premises").

Owner and Resident agree to the following amendment to the Lease Agreement:

The third paragraph, fourth sentence of Section 4 is amended to read: "Resident BAH allotments shall be payable on the first day of the month for the prior month's rent."

All other terms and conditions of the Lease Agreement shall remain in full force and effect.

Resident:                                   Forest City Residential Management, Inc.
_KP&d PoA_                                   Agent for Owner

                                            By: _____

Date: _8/25/15_                             Date: _8-26-15_

**Forest City Southern Group LLC**
**Neighborhood Management Office**
**303 Patrick Drive**
**Keesler, MS  39531**
**Harrison County**
**(228) 374-5336**

RE:  An Important Notice to Residents about Your Payments Paid by Check

Please be advised that Forest City Southern Group LLC electronically processes your payments that are paid by check.  Your checks will be converted into electronic transactions and processed through the Automated Clearing House (ACH) network—the same system commonly used for direct deposit payroll.

Simply pay by check as you would normally do—it's that easy. The receipt of your check will authorize us to electronically debit the bank account on which the check was written.  Please note that your check can clear as early as the day it is scanned, and that you will not receive your check back from your financial institution.

Your electronic payments will appear on your bank statement as an electronic debit, showing the date of the debit, your check number if applicable, and on the payee line, "Forest City Southern Group LLC."

You may drop off your payment at the lock box or when visiting our offices, or you may mail your payment to the Management Office.   When you provide a check as payment, your check will be converted into an electronic transaction and processed through the Automated Clearing House (ACH) network.

Sincerely,

Jamie Seehafer

Forest City Southern Group LLC

Household Initials and Date:

KP  P.O.A        8/25/15

Address:

226 Fairchild

# PET ADDENDUM

This will serve as an Addendum to the Lease Agreement dated **8-26-15**, between Forest City Southern Group, LLC ("Owner") and **William Pate** ("Resident"), regarding property located at **226 Fairchild** (the "Premises").

1.  Resident is authorized by the Owner to keep a pet(s), described as:

| Type: | Size: | Color: | Name: |
|-------|-------|--------|-------|
| Dog | sm | Bran | Coco |

NOTE: Owner to attach photo of all authorized pets.

2.  Owner has the right to refuse certain breeds. Those breeds are identified in the Lease Agreement and Community Handbook. All pets must be licensed in accordance with all applicable laws and regulations. All dogs must wear a collar with the required dog tag attached. Licenses must be renewed on or before the expiration date of current tags. All cats are required to have an identification tag on their collar with the owner's name, address and telephone number. All dogs and cats will receive or must have a permanent microchip electronic identification implant.

    The pet(s) must have current inoculations and Resident shall submit records of inoculation upon Owner's request. Rabies immunizations are required for dogs and cats and must be documented with shot tags on the pet's collar.

3.  Resident agrees to pay Owner a refundable Pet Deposit of $**250**. The Pet Deposit is not a limit of Resident's liability which includes, but is not limited to, property damages, cleaning, deodorization, flea extermination costs, carpet or other flooring replacement, and/or personal injuries. Resident will be liable for the entire amount of any injury to the person or property of others caused by such pet(s). Resident is encouraged to obtain liability insurance.

4.  Resident agrees to comply with:

    a.  The terms and conditions set forth herein, in Paragraph 45 of the Community Handbook, and in Paragraph 10 of the Lease Agreement to which this addendum is attached;

    b.  All applicable laws and regulations, such as, but not limited to, permitted breeds, licensing, inoculations, animal behavior, etc.; and

    c.  Such rules and regulations that may be reasonably adopted from time-to-time by Owner that will be provided to Residents by written notification.

5.  Resident shall not permit the pet to cause any damage, discomfort, annoyance, nuisance or in any other way to inconvenience or cause complaints from any other Resident(s). Owner shall give written notice to the Resident requesting the complaint be remedied within three days. If, in the Owner's opinion and judgment, Resident has not remedied the complaint within three days, Resident agrees to permanently remove the pet from the Premises and Neighborhood immediately. Owner has the right to inspect the Premises for possible damages incurred by the pet with a twenty-four (24) hour notice.

6. Vicious or violent animal misbehavior is prohibited and may result in the immediate removal of the pet from the Premises and Neighborhood.

7. All animals except dogs and cats must be kept in cages or tanks at all times. Dogs must be confined to the Premises or restrained by a leash or fence in the back yard of the Premises. Restraint shall include leashing or chaining the animal to a stationary object to preclude the animal from running free or interfering with the normal flow of pedestrians and traffic. Restraining dogs in front of the Premises is prohibited. Dogs outside Resident's fenced yard must be leashed at all times. Both dogs and cats must be appropriately and effectively restrained and under the control of the Resident or Occupant while on the property. No pets, with the exception of service animals, are permitted in the community rooms, lounge, laundry rooms, offices, recreation areas, or other common room areas.

8. Resident is responsible for removing pet waste promptly from the Premises and the Neighborhood common areas. If available, the Neighborhood will have a common area set aside for pet exercise and relief, but it remains the Resident's responsibility to clean up any waste from their pet. Disposal of pet waste droppings are to be handled as follows:

> <u>Cats:</u> Cat must have a litter box. Litter should be cleaned daily and changed and removed twice weekly. The litter must be wrapped and sealed before being disposed of in the trash.

> <u>Dogs:</u> Dog owners are not permitted to leave pet waste droppings <u>anywhere</u> in the Neighborhood. Dog owners must carry a "pooper scooper," disposal bag and clean up after their animal. The picked up droppings must be wrapped and sealed before being disposed of in the trash.

> <u>Other Pets:</u> Droppings and cage litter must be frequently and regularly disposed of in wrapped and sealed bags. These bags are then disposed of in the trash.

Violation of this provision will result in an automatic waste removal charge of $20.00 per occurrence.

9. Dogs are not permitted on children's playgrounds.

10. Resident agrees to have the Premises professionally treated for fleas and ticks prior to vacating, if necessary. Proof of treatment must be provided to Owner. Owner will notify Resident of any required professional treatment for fleas and ticks if determined after thorough assessment during the preterm move-out inspection.

11. Violation of the above terms will be considered a breach of the Lease Agreement, which may result in removal of the pet from the Premises and/or termination of the Lease Agreement.

12. The pet owner will be liable for damages and/or injuries caused by a pet. Resident's liability includes, but is not limited to, property damages, cleaning, deodorization, flea or other pest extermination costs, carpet or other flooring replacement, and/or personal injuries. Resident will be liable for the entire amount of any injury to the person or property of others caused by such pet(s).

13. On the occasion of a loose or unattended pet, Owner will contact the Resident pet owner. The Resident must immediately come and get the animal. If the animal remains loose, Owner will contact the Animal Control Section or other appropriate authority to pick up the animal and take it to the shelter.

14. If Resident is unable to care for the pet and abuse or neglect of the pet occurs, Owner will first contact the designated point of contact. In the event the point of contact person is not of assistance, Owner will report the incident to the appropriate local agency.

PET CARE:

**Tying of Pets:** Pets may not be tied to common area trees, porches or any common area in the Neighborhood.

**Noise and Odors:** Pet owners are responsible to control pet noise and odor.

**Breeding:** Residents may not breed animals on the Premises.

**Inspections:** Owner will have the right to inspect the Premises, upon notice to the Resident, if written complaints have been received or upon demand (after a 24-hour notice) if Owner has reason to believe the pet is a threat to the health and safety of other Residents or the Neighborhood.

**Removal:** Owner and their Agent have the right to enter a Premise and remove a pet that has become vicious or is a threat to other Residents if the Resident refused to remove the pet or cannot be contacted.

**Absence of Owner under Emergency Situations:** Resident will contact the identified emergency contact or those parties identified to assist with a pet in the case of an emergency. In the event that the emergency contact cannot be contacted or does not respond within 24 hours, Owner will report the situation to the Animal Protective Shelter, local dog catcher or other appropriate authority. Such circumstances shall be deemed an emergency for the purpose of Owner's right to enter the Resident's premises with such Agent to allow the authority to remove the animal from the Premises. The cost of the care facility will be borne by the Resident.

**Owner Intervention:** Owner exercises the right to act immediately if a Resident fails to properly care for said pet and the pet is an aggressive animal, sick, injured, or deceased. Owner will contact the Resident's designated point of contact upon determination of inadequate Resident response to such problems. If the designated point of contact is of no assistance, Owner will contact the Animal Protective Shelter or other appropriate authority to remove the pet at the pet owner's expense.

**Owner Liability:** Owner and/or its Agent are absolved by the Resident or designated point of contact of any or all liability, financial or otherwise, for actions taken on behalf of the Resident pet owner or the well-being of the pet as may be permitted by state or local law.

Failure to comply with the Pet Policy contained in the Community Handbook, the Pet Addendum and the Lease Agreement may result in the removal of the cat(s) or dog(s) from the Premises and/or eviction of the Resident from the Premises. Any Resident who has been required to remove a cat or dog due to violations of the Pet Policy or the Pet Addendum will not be permitted to have any cats or dogs on the Premises.

Resident:                                           Forest City Residential Management, Inc.
_Kecto RoA_                                        Agent for Owner

_____              By: _____

Date: _8/26/15_                                    Date: _8-25-15_

# MOLD ADDENDUM

This will serve as an Addendum to the Lease Agreement dated  *8 - 26 - 15*  , between
Forest City Southern Group, LLC, Owner, and  *William Pete*  ,
("Resident"), regarding property located at  *226 Fairchild Dr*  ,
(the "Premises").

Owner desires to maintain a quality living environment for Resident.  To help achieve this goal, it is important for the Owner and Resident to work together to minimize any mold growth in the Premises. This Addendum contains information for Resident, and the responsibilities of both Resident and Owner.

1. **ABOUT MOLD:**  Mold is found virtually everywhere in the environment – indoors and outdoors in new and old structures.  When excess moisture is present inside a Premises, mold can grow. Appropriate precautions need to be taken to minimize the potential for mold growth in the Premises.

2. **PREVENTING MOLD:**  In order to minimize the potential for mold growth, Owner recommends the Resident should do the following:

   a. Keep the Premises clean – particularly the kitchen, bathroom(s), carpets and floors.  Regular dusting, vacuuming and mopping removes household dirt and debris that contribute to mold growth.  Use environmentally safe household cleaners.  A vacuum cleaner with a HEPA filter will help remove mold spores.  Immediately throw away moldy food.

   b. Do not block or cover any heating, ventilation, or air conditioning ducts.  Whenever possible, maintain a temperature of 50 to 80 degrees Fahrenheit in the Housing Unit.

   c. Remove visible moisture accumulation on countertops, windows, windowsills, walls, ceilings, floors, and other surfaces as soon as reasonably possible.  Periodically clean and dry the walls and floors around the sink, bathtub, shower, toilet, windows, and patio doors using a common household disinfecting cleaner.  Blot dry spills on carpeting.

   d. Look for leaks in washing machine hoses, faucets, and discharge lines, especially if the leak is large enough to infiltrate into nearby walls.

   e. Use the bathroom fan when bathing or showering and allow the fan to run until all excess moisture has been vented from the bathroom.  Keep the shower curtain inside the tub or fully close the shower doors when showering.  After taking a shower or bath: (i) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (ii) leave bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (iii) hang towels and bath mats so they will completely dry out.

   f. Use the exhaust fan in the kitchen when cooking or while running the dishwasher and allow the fan to run until all excess moisture has been vented from the kitchen.

   g. Open windows and doors on days when the outdoor weather is warm and dry (humidity is below 50 percent) to help humid areas of the Premises dry out.  Run the fan on the furnace to help circulate fresh air.  Keep windows and doors closed in damp, humid, or rainy weather.

   h. Clean the lint filter in the clothes dryer after each use and promptly report any damage to the vent connection.  If condensations forms in the area, wipe it dry.  Dry damp clothing as quickly as possible.

Forest City Southern Group, LLC

Mold Addendum

    i.   Limit houseplants to a reasonable number to limit excess humidity and limit molds that could grow on the soil surface. Avoid over watering.

    j.   Do not overfill closets or storage areas. Overcrowding restricts airflow.

    k.   Promptly report to the Neighborhood Management Office:

        i.   Any leak, water damage, or signs of water infiltration;

        ii.   Any malfunction in the heating, ventilation, or air conditioning system;

        iii.   Windows or doors that do not open or close properly;

        iv.   Any areas of visible mold (except very small areas that respond to routine cleaning);

        v.   Musty or moldy odors;

        vi.   Health issues that Resident thinks may be linked to the air quality within the Premises;

        Owner will respond in accordance with this Lease to repair or remedy the situation as necessary.

3. **EXISTING MOLD:** If small areas of mold have already formed on non-porous surfaces (such as ceramic tile, Formica, vinyl flooring, metal, wood or plastic), the Environmental Protection Agency ("EPA") recommends cleaning the areas with soap or detergent and water, letting the surface dry, and then, within 24 hours, applying a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant®, Tilex Mildew Remover®, or Clorox Cleanup. Tilex and Clorox contain bleach that can discolor or stain. **Follow the instructions on the container.** Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface. Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be in adjacent areas, but not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air ("HEPA") filter can be used to help remove mold products from porous items such as sofas, chairs, drapes and carpets – provided fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

4. **DO NOT CLEAN OR APPLY HOUSEHOLD BIOCIDES TO:** (a) visible mold on porous surfaces such as sheetrock walls or ceilings; or (b) large areas of visible mold on non-porous surfaces. Instead, notify Owner in writing; Owner will take appropriate action in compliance with applicable law.

5. **COMPLIANCE:** If Resident fails to comply with this Addendum, Resident may be held responsible for damage to the Premises and any health problems that may result.

Resident:                                       Forest City Residential Management, Inc.

*KPdb PoA*                                  Agent for Owner

*KPdb*                                     By: _____

Date: 8|25|15                            Date: 8-26-15

# RECEPTION DEVICE ADDENDUM

This will serve as an Addendum to the Lease Agreement dated *8-26-15*, between
Forest City Southern Group, LLC, ("Owner"),
and                                                    *William Pate*,
("Resident"), regarding property located at            *216 Fairchild*,
(the "Premises").

Resident may install a satellite dish or stick-type reception device (collectively and separately, the "Reception Device") on or about the Premises to receive direct broadcast satellite, fixed wireless signals via satellite, and commercially available analog or digital TV. Resident hereby agrees to comply with the following:

1.  The Reception Device must be approximately 39.37 inches or less in diameter if a dish or less than 39.37 inches in length if a stick-type Reception Device.

2.  The Reception Device shall be installed safely and securely after all appropriate permits have been obtained. The Reception Device shall be installed and operated in accordance with all applicable federal/state/local laws and regulations. In the event the Resident is cited because the installation constitutes a building or fire code violation, the Resident is responsible for immediate correction and compliance with the building or fire codes. Resident shall be responsible for any interference caused or generated by the Reception Device.

3.  Installation must be in strict accordance with plans and specifications (the "Plans") submitted to Owner and approved by Owner in writing, which approval shall not be unreasonably withheld, delayed or conditioned. The Plans must set forth the precise size, color, and weight of the Reception Device; the precise location where the Reception Device is to be located; and all wiring and other facilities to be installed. Appropriate cable raceways and brackets must be set forth on the Plans.

4.  The Reception Device must be located entirely within the Resident's Premises and shall not be installed in any common area. The Reception Device must <u>not</u> be installed on windows, firewalls, outside walls, glass, outside windowsills, roofs, or balconies. The Reception Device cannot be mounted on the side of a building.

5.  Resident may not damage or alter the Premises to install the Reception Device. <u>No holes whatsoever may be drilled</u> through outside walls, firewalls, glass, windows, roofs, balconies, balcony railings, or through anything else. No holes may be drilled through walls or anything else to bring in wires.

6.  The Reception Device must not protrude or hang over any balcony or extend beyond the patio or balcony railing line. The Reception Device must not be installed upon an overly elongated pole or any extension device that hangs out over a balcony.

7.    Resident's installation: (a) must comply with reasonable safety standards; (b) may not interfere with the Neighborhood's cable, telephone or electrical systems or those of neighboring properties; (c) may not be connected to the Neighborhood's telecommunications systems; (d) may not be connected to the electrical system except by plugging into a 110-volt duplex receptacle, and (e) cannot be placed within unsafe distances from power lines. Owner may require reasonable screening of the Reception Device by plants, etc., so long as it does not impair reception.

8.    The Reception Device shall be installed and operated in accordance with all applicable laws and regulations. Owner and/or Agent for Owner shall not be liable in any manner by reason of their approval of the Plans, and Resident assumes all such liability and is solely responsible for the Plans and the compliance of the Plans with all applicable laws and regulations.

10.   Resident will remove the Reception Device on or before the expiration or termination of the Lease Agreement. Resident will repair all damage caused by the removal and will restore the Premises to its prior condition before the installation of the Reception Device.

Resident:

_Kecto PoA_

_Kecto_

Date: _8|25|15_

Forest City Residential Management, Inc.
Agent for Owner

By: _____

Date: _8 - 26 - 15_

# FLAG ADDENDUM

This will serve as an Addendum to the Lease Agreement dated _8 - 26 - 15_ between Forest City Southern Group, LLC, Owner, and _William Pate_ ("Resident"), regarding property located at _226 Fair Child Dr_ (the "Premises").

Resident has requested permission to display and hang a United States Flag, a standard Military Service flag or other flags on or about the Premises. United States Flags are an expression of support and patriotism. Standards for handling and displaying the U.S. Flag are set forth by the United States Code, written into law by Congress in 1942. Owner is willing to permit the display and hanging of flags in accordance with the following terms to which Resident hereby agrees:

1. A standard size United States flag and appropriate apparatus (pole and stanchion) must be mounted in an approved exterior area on the Premises for flying the flags. Stanchions and poles must be securely attached to the exterior of the residence. Stanchions and poles should be weather resistant and made of durable materials.

2. Size and type of flags shall be approved by the Neighborhood Management Office before displaying and use.

3. Resident may not damage or alter the Premises and may not drill holes through outside walls. Flags shall be located at a reasonable height that is within reach of the Resident without obstructing entrances or windows.

4. The union of the U.S. Flag should be at the peak of the staff unless the flag is at flying at half staff.

5. U.S. Flags shall normally only be displayed from sunrise to sunset, but may be displayed twenty-four a day if properly illuminated during the hours of darkness. If US. Flags are displayed after sunset, appropriate spot lighting controlled by an interior switch (inside the home) is required to ensure flags are illuminated at night. Lighting installation must comply with reasonable safety standards and not be connected to the electrical system or wiring of the Premises.

6. U.S. Flags may be displayed every day, but especially on:
   a. New Year's Day
   b. Inauguration Day
   c. Martin Luther King Jr. Birthday
   d. Lincoln Birthday
   e. Washington Birthday
   f. Easter Sunday
   g. Mother's Day
   h. Armed Forces Day
   i. Memorial Day

j.  Flag Day
k.  Father's Day
l.  Independence Day
m.  Labor Day
n.  Constitution Day
o.  Columbus Day
p.  Navy Day
q.  Veterans Day
r.  Thanksgiving Day
s.  Christmas Day
t.  State Birthdays
u.  State Holidays
v.  Other days proclaimed by the President of the United States

7.  No disrespect shall be shown to the flag of the United States of America.  The flag should not be dipped to any person or thing.

8.  The U.S. flag should never touch anything beneath it, such as the ground, the floor, water, or merchandise.

9.  The U.S. flag should never be displayed with the union down, except as a signal of dire distress in instances of extreme danger to life or property.

Resident:

x  _Keo PoA_

_Keo_

Date:  _8/25/15_

Forest City Residential Management, Inc.
Agent for Owner

By:  _____

Date:  _8-26-15_



226 Fairchild

## WEAPON REGISTRATION FORM

The possession of personal firearms, government-owned arms and ammunition will be in accordance with the laws of the State of Mississippi and any local laws or ordinances. All firearms must be registered with the Neighborhood Management Office within three (3) days of occupancy or procurement of firearms. Firearms and ammunition must be stored separately in safe, locked locations. Loaded guns in the Premises are prohibited. Possessing a weapon prohibited by state/local ordinance or displaying or discharging a weapon in the Community is prohibited. Hand grenades, bombs and blasting explosives are prohibited. Failure to adhere to this provision is a material breach of the Lease Agreement.

| Weapon | Registration | How Stored |
|--------|-------------|------------|
| None | | |
| | | |
| | | |
| | | |
| | | |

Resident:

KReD POA

KReD

Date: 8 25 15

Forest City Residential Management, Inc
Agent for Owner

By: _____

Date: 8-26-15

# ACCESS GATE ADDENDUM

This will serve as an Addendum to the Lease Agreement dated $\underline{8-26-15}$ , between Forest City Southern Group, LLC, ("Owner"), and $\underline{William \ Pate}$ ("Resident"), regarding property located at $\underline{226 \ Fairchild}$ , (the "Premises").

1.  The Neighborhood is equipped with electronically controlled access gates. The installation of access gates does not constitute an agreement by Owner to provide security to Resident, Resident's family, guests, occupants or visitors of the Premises. Resident acknowledges that the access gates are mechanical devices that could periodically malfunction, fail or be rendered inoperative, and that there is no absolute guarantee that the access gates if they properly function will in any way increase security or prevent theft, assault, vandalism or damage to the person or property of Resident. Resident agrees that Owner shall not be liable for any injury, damage, or loss to any person or property of Resident caused by any other person including but not limited to theft, burglary, trespass, assault, vandalism, or any other crime. Further, Resident agrees that Owner shall not be liable for any damage or loss of any motor vehicle or Resident which results from any of the access gates coming into contact with any such motor vehicle, irrespective of whether such contact is the result of some problems, defect, malfunctions or failure of the access gates.

2.  Express disclaimer of warranty: Neither management, owner, owner's agents, employees nor representatives make any warrant express or implied, as to the condition of access gates for their fitness for any particular purpose, or the likelihood that the access gates will increase the security of the property.

3.  Resident acknowledges and agrees that neither Owner does not distribute, sell, supply, repair, service, or install the access gates. Although Owner agrees to take reasonable steps to cause the gates to be repaired, resident agrees that Owner is not responsible for any problem, defect, malfunction or failure of the access gates. Neither contained in the addendum shall in any way impose any responsibility, duty or liability upon Owner of the installation and or operation of the access gates. Resident shall never take demand upon, look to or institute or prosecute suit against Owner for any damage costs, loss of personal property (including, but not necessarily limited to motor vehicles), or damage to or injury to their person as a result of arising out of, or incidental to any problem, defect malfunction or failure of the access to increase security or prevent theft, burglary, trespass, assault, vandalism, or any other crime. Resident understands that this is an express covenant not to sue, and Resident here by releases Owner, and all liabilities connected with the access gates. Resident agrees that if Resident or any guests, or any other person providing a service to Resident (such as for example, moving van or delivery truck), shall damage any of the access gates, the Resident shall be liable to Owner for the cost of repair of the access gates and Owner shall have the right to charge such cost of Resident; it being understood and agreed upon that it shall be the responsibility of Resident and such other persons providing a service to Resident to operate their motor vehicles in such a manner so as the stay clear of and not come into contact with the access gates.

4.  I acknowledge receipt of two electronically coded controlled-access gate card(s). I accept full responsibility for the protection and safeguarding of the access card(s). I agree not to loan the access card(s) to another. I acknowledge that the access card(s) is the property of

the Owner and has been issued by Owner. I understand that Owner has the right to limit or restrict the use of the card and I agree to surrender the access card(s) upon demand. I agree to immediately notify the neighborhood management office should the access card(s) be lost, stolen, or misplaced. I agree to pay $10 per card should it become necessary to issue a replacement access card.

Resident:

~~Rod POA~~

~~KPCO~~

Date: 8|25|15

Forest City Residential Management, Inc.
Agent for Owner

By: _____

Date: 8-26-15

# FOREST CITY
### R E S I D E N T I A L

## PERMISSION TO ENTER

COMMUNITY NAME: _West Falcon_

ADDRESS: _226 Fairchild_

### ROUTINE MAINTENANCE AND/OR SERVICE REPAIRS

☒ Permission is hereby given to Management to enter my home for maintenance and repairs as requested. It is understood that this permission covers service and repairs in my home by management personnel and/or their subcontractors.

☐ I prefer to make provisions to sign for permission to enter for _each_ service and/or repair requested

Resident's Signature: _KReed PoA_          Date: _8|25|15_

Resident's Signature: _KReed_          Date: _8|25|15_

### DELIVERY AND/OR INDIVIDUAL PERMISSION TO ENTER

**NOTE:** Written permission from the resident must be given to Management to permit persons or companies to have access to their home for delivery or service. Management assumes no responsibility for damaged or missing items.

| DATE | REASON FOR ENTRY | PERSON/COMPANY TO ENTER | RESIDENT'S SIGNATURE |
|------|------------------|-------------------------|----------------------|
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |
|      |                  |                         |                      |

### *PERMISSION TO ENTER YOUR HOME IS NOT REQUIRED IN CASE OF AN EMERGENCY*
Emergency situations include breaks in water/heating pipes, water leaks, smoke or fire, cause to believe a critical medical problem exists, or structural damage to your home.

DISTRIBUTION:          Resident's File

# KEESLER COMMUNITY CENTER AGREEMENT



**FORESTCITY**
MILITARY COMMUNITIES
**KEESLER**

300 Patrick Drive, Keesler AFB, MS 39531

phone: (228) 374-5336   fax: (228) 546-3075

www.fckeeslerafb.com   FORESTCITY ⌂

## PERMITTED USE   *2537* ✱

The Community Center is for use by Residents and occupants of Forest City Southern Group, LLC ("FCSG") homes, and authorized guests, service providers sponsored or approved by FCRM, and certain approved Air Force affiliated organizations. Equitable services will be provided for all programs and no program or user will receive preferential privileges. Rooms or spaces in the Community Center will not be designated for the exclusive use by any organization, nor used as a recreational, educational and similar activities or functions. Retail sale activities, religious services, and political gatherings shall not be permitted. No one under the age of sixteen (16) is permitted without a parent or guardian at all times.

## INDEMNIFICATION AND HOLD HARMLESS

Neither FCRM nor NCSG, nor their principals, agents, and employees shall be liable for, nor does Resident/User of the Community Center waive, all claims for loss or damage sustained by FCRM or FCSG. Resident/User of the Community Center agrees to indemnify the following parties and hold them harmless: FCSG, management, agents, principals, and employees of FCRM (all of causes of action, of whatever nature and including attorney fees, which arise in any way in connection with the provision of services by the indemnitors or indemnitors' agents or employees to provide such services to such Residential/Users; or in any way arising out of the provision of services, or failure to provide services, by the Indemnitors on the Community Center premises to any individual or individuals. Notwithstanding the foregoing, Resident/User will not hold indemnitors negligence or willful misconduct of the indemnitors.

By signing this contract, the Resident/User certifies that:

Resident/User is a resident of a home in an FCRM managed Air Force Family Housing Community, or is otherwise authorized by FCRM to rent a Community Room, and all rent and fees due to FCRM are current and paid in full. Resident/User fully understands all terms of this rental agreement and will fully abide by this contract.

_KRAD POA_

**Resident/User Signature**

_8, 25, 15_

**Date**

_216 Fairchild_

**Address**

( )

**Phone Number**

**FCRM Representative Signature**

_8, 26, 15_

**Date**

|  | Date | Resident Initials | FCRM Rep. Initials |
|---|---|---|---|
| **Access Cards Provided** |  |  |  |
| **Access Cards Provided** |  |  |  |

**Please Initial Acceptance of Each Policy:**

## FITNESS CENTER   KP - PoA

- The Forest City Fitness Center is a "use at own risk" facility, there is no instructor or personal trainer on-site.
- It is recommended that all individuals consult with their personal physician prior to performing any physical activities. The Fitness Center is equipped with machinery that may not be suitable for those with certain health concerns.
- All equipment in the Fitness Center is property of FCRMI, and should be used with the utmost care and consideration.
- Room temperatures are not to be disturbed.
- Personal entertainment devices may be used with headphones.
- As courtesy to other Residents, use of cardiovascular equipment us limited to 20 minutes when others are waiting.
- For sanitation purposes, Residents will wipe down equipment after each use with antibacterial wipes provided at facility.

## MULTI - PURPOSE ROOM   KP - PoA

- All tables, chairs, countertops, and appliances are to be cleaned and returned to its original location at the end of each event.
- Tablecloths must be used if activities involve crafts, ink, paint or any other substance(s) that could damage tables.
- Tables and chairs must be moved to their original placement.
- Cleaning supplies and kitchen utensils are not to be removed or you will be charged for their replacement cost.

## ALCOHOL POLICY   KP - PoA

- Alcohol is strictly prohibited in the Community Center.
- There will be no exception to this policy and any violation will result in the immediate termination of the function, as well as the Resident/User's Community Center privileges being revoked.

## ADDITIONAL RULES AND POLICIES  KP - PoA

- Resident/USER is required to abide by local fire codes, and the number of guests at an event may not exceed the maximum posted occupancy of that particular facility.
- Noise levels emanating from the event must remain such a level as not to create a disturbance or nuisance to residents in the surrounding community.
- Smoking is NOT permitted on the premises of the Community Center.
- No decorations or meeting materials may be taped, tacked or affixed to walls, windows, doors, ceilings or ceiling fans.
- Thumb tacks, nails, paint, crayons, ink or any other material that might damage the walls, floors or other furnishings of the Community Center are prohibited, and if utilized, the Resident/User will bear the cost of returning the Community Center to its original condition.
- Pets (except authorized, trained service animals), firearms, and weapons are not permitted in the Community Center at any time.
- Resident/User will supervise all activities of persons under he age of sixteen (16) with a suitable number of adults.
- Resident/User will be responsible for their own security throughout the use of the Community Center.
- FCRM shall have the right to access the Community Center at anytime during the Resident/User's use.
- Parking at the Community Center is allowed in "Designated Areas" only.

## CLEANING RESPONSIBILITIES  KP - PoA

Resident/User is required to clean the Community Center and return it to its previous condition, prior to vacating the premises. Keep in mind that others may be using the facility after your event. Cleaning time should be anticipated by Resident/User and be concluded within the rental time as indicated above. Resident/User should refer to the cleaning checklist provided by FCRM prior to the event.

- All bathroom and kitchen facilities shall be cleaned and returned to the same condition as when the Resident/User entered the Community Center.
- Resident/User is responsible for removing all trash accumulated as a result of Resident/User's use f the Community Center, from the facility and the surrounding premises, upon completion of the event. Trash will be placed in garbage bags provided by FCRM and disposed of in the container in the adjacent, outside dumpster. The dumpster lid must be able to close and be secured. If the dumpster has reached full capacity, the Resident/User is solely responsible for arranging an alternate means of disposal.
- At the end of your event, please call _____, please secure building and make sure the following is complete before you exit:
  - All doors are locked
  - Lights are turned off

**Failure to comply with the cleaning responsibilities may result in the forfeiture of the full amount of the security deposit. The Resident/User shall reimburse FCRM for all costs incurred to complete, and/or affect repairs of the Community Center, due to the actions of the Resident/User, that exceed the full amount of the security deposit.**

**Welcome Home to Forest City at Keesler Air Force Base!**

Many of your questions about your new neighborhood can be answered by the enclosed flyers. Please take a moment to review them. If you have any questions, please do not hesitate to contact the Neighborhood Management Office (NMO) at: (228) 374-5336.

Emailed to Member:

- We're on Facebook
- Bulk Trash Pick Up
- Deployed Spouse Program
- Do's & Don'ts of Yard Maintenance
- Yard Care – tips & tricks
- Window Safety
- Garbage Disposals: Do's & Don'ts
- Helpful Base Numbers
- Map of Base
- Need a Quick Fix – Self Help
- Referral Program
- Resident Resolution Process
- Smoke Detector Awareness
- What You Should Know About Mold
- Grease Recycling Program

Give to Member at Lease Signing:

- Water Conservation Tips
- Air Force Bill of Rights
- Solutions to Storm Water Pollution
- Feedback Card

_____          _____
Signature                               Date

**Ed Williams**

| | |
|---|---|
| **From:** | office@moldtestusa.com |
| **Sent:** | Tuesday, April 18, 2017 10:29 AM |
| **To:** | Ed Williams |
| **Subject:** | MTUSA Please Confirm |
| **Attachments:** | Chain of Custody.pdf |

## Booking Info

| Booking Date | Booked by | Inspector Assigned |
|---|---|---|
| 4/7/2017 | Kat Quarles | Ed Williams - Pascagoula MS |

## Schedule Info

| Schedule Date | Schedule Time | Schedule Day |
|---|---|---|
| 4/20/2017 | 6:00 | Thursday |

## Customer Information

| Customer Name | Customer Phone Number | Site Ownership |
|---|---|---|
| Rushing and Guice | (228) 374-2313 | Owner |
| **Customer address** | | |
| 226 Fairchild Dr, Biloxi, MS 39531 | | |

## Inspection Info

| Type of Test | Base Price | Expedite | Electricity |
|---|---|---|---|
| Pre | $475.00 | No | Yes |

## Site Contact Info

| Name | Contact Number | Relation to Site |
|---|---|---|
| Christina Pate | (334) 333-0634 | Tenant |

## Additional Information

N/A

## Mileage Bonus (if any)

$25.00

## AFTER THE JOB, SAME DAY

- Send the samples and fully completed Chain of Custody to the lab





**52-Point Visual Inspection**

| | |
|---|---|
| Prepared for | Rushing and Guice |
| Site Address | 226 Fairchild Dr |
| City | Biloxi    State MS    Zip 39531 |
| Inspector | Ed Williams |
| Date | 4/20/2017    Time 6:00PM |

This inspection for mold or fungi is performed for a fee to visually inspect for signs of a mold like substance, fungi or growth. It may also include air, swab or bulk tests to be performed with their associated lab fees.

A fee is charged per sample. All fees must be paid prior to sending in any samples. Sample tests should be considered at each area that visible evidence is present. Whether this report reveals mold in the building or not, the customer, building owner or potential buyer should consider:

1. Whether or not to have any sample tests performed at any area that was noted in the report.
   - We always suggest to have a Direct ID Sample for visible microbial growth.
   - If someone is sick in your home, we always suggest to have the areas they spend most of their time in to be tested.

2. Whether or not to hire a qualified mold remediation company or industrial hygienist for further consultation, inspection or corrective procedures, either now, before the lab tests results, or afterwards.

**Important**: If you do have mold and it must be removed, you are strongly encouraged to obtain the services of a qualified remediation contractor. If a homeowner or contractor unfamiliar with containment, removal and safety practices performs remediation activities, building occupants can be put at elevated health risks and mold may spread to areas that previously had no contamination. Failure to eliminate source(s) of moisture in the building that are allowing mold to flourish will render remediation efforts ineffective.

| Client Present | Age of Home | Weather | Exterior Temp |
|---|---|---|---|
| Tenants | 12+ | Sunny | 89.7 |



# OUTSIDE

| | | | |
|---|---|---|---|
| 1 | Is there standing water in the yard? | Yes ☐ | No ☒ |
| 2 | Does the land slope towards the home or building? | Yes ☐ | No ☒ |
| 3 | Are gutters present? | Yes ☒ | No ☐ |
| 4 | Are downspouts present? | Yes ☒ | No ☐ |
| 5 | Is there vegetation against house or building? | Yes ☐ | No ☒ |

Comments: (Note anything visible)

4 - No EXTENSIONS

## ROOF (Do not climb onto roof)

| | | | | |
|---|---|---|---|---|
| 6 | Are there missing or broken shingles? | How many? | Yes ☐ | No ☒ |
| 7 | Are the shingles older than 10 years? | | Yes ☐ | No ☒ |
| 8 | Are any flanges around the vents loose? | | Yes ☐ | No ☒ |
| 9 | Is any flashing loose? | | Yes ☐ | No ☒ |

Comments: (Note anything visible)

6 - NONE VISIBLE from ground or WINDOWS

## Foundation Type

| 10 | Basement ☐ | Crawl ☐ | Slab ☒ |
|---|---|---|---|

## Basement

| | | | |
|---|---|---|---|
| 11 | Is there a dehumidifier in place? | Yes ☐ | No ☒ |
| 12 | Are there any carpeted areas? | Yes ☐ | No ☒ |
| 13 | Is there a sump pump? | Yes ☐ | No ☒ |

Comments:

11 - 13  N/A



**52-Point Visual Inspection**

## Crawl Space (Enter only if safe to do so)

| # | | | |
|---|---|---|---|
| 14 | Are there any leaks? | Yes ☐ | No ☒ |
| 15 | Is there microbial growth? | Yes ☐ | No ☒ |
| 16 | Is there a vapor barrier? | Yes ☐ | No ☒ |
| 17 | Is the vapor barrier totally sealed and intact? | Yes ☐ | No ☒ |
| 18 | Is the crawl space totally encapsulated? | Yes ☐ | No ☒ |
| 19 | Is there room for you to crawl? | Yes ☐ | No ☒ |
| 20 | Is there any rot? | Yes ☐ | No ☒ |
| 21 | Is the insulation intact? | Yes ☐ | No ☒ |
| 22 | Is the insulation wet? | Yes ☐ | No ☒ |
| 23 | Is the duct work intact? | Yes ☐ | No ☒ |
| 24 | Any condensation around the ducts? | Yes ☐ | No ☒ |
| 25 | Are the floor joists intact? | Yes ☐ | No ☒ |
| 26 | Is there a dehumidifier in place? | Yes ☐ | No ☒ |
| 27 | Are any vents blocked off? | Yes ☐ | No ☒ |

Comments:

14-27 - N/A   NO CRAWL SPACE



52 Point Visual Inspection

# INSIDE

## Microbial Activity

| | | | Yes ☒ | No ☐ |
|---|---|---|---|---|
| 30 | Any Microbial Activity? (e.g., carpet, drapes, walls, ceilings, cabinets, etc.) | | | |
| 31 | Is there a musty odor present? | | Yes ☒ | No ☐ |
| 32 | Are there any water marks? | | Yes | No |

Comments:

30. MSTR bath shower ceiling, BR2 - ceiling in NC around vent
    RO2 - Door Frame Right side / & Left side
    RO2 - A/C Vent off unit

32  WATER HEATER bASE

30. Left side of house & around Dryer VENT (EXTERIOR)
    Around Front Window (EXTERIOR)

## Attic

33   Anything suspicious? (including lack of proper ventilation)   Yes ☐   No ☒

**DUE TO LIABILITY, WE DO NOT GO INTO THE ATTIC UNLESS THERE IS A SUSPECTED AREA OF CONCERN.**

Comments:   NONE

## Kitchen and Laundry

| | | | |
|---|---|---|---|
| 34 | Is the dryer ventilation intact? | Yes ☒ | No ☐ |
| 35 | Are there any leaks behind the washer? | Yes ☐ | No ☒ |
| 36 | Are there any leaks under or behind refrigerator? | Yes ☐ | No ☒ |
| 37 | Are there any leaks under kitchen sink? | Yes ☐ | No ☒ |

Comments:
        NONE



## 52-Point Visual Inspection

# Bedroom/Office(s)

**\*\*Indicate Name of Bedroom/offices**

**R01** Dishway     **R02** DOWNSTAIRS STORAGE

| # | Question | R01 | R02 |
|---|----------|-----|-----|
| 38 | Any microbial activity around windows? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ No ☒ | Yes ☒ No ☐ |
| 40 | Are HVAC vents clean? | Yes ☒ No ☐ | Yes ☐ No ☒ |
| 41 | Is the paint or plaster cracking? | Yes ☐ No ☒ | Yes ☐ No ☐ |

**\*\*Indicate Name of Bedroom/offices**

**R03** GARAGE     **R04** Living Rm

| # | Question | R03 | R04 |
|---|----------|-----|-----|
| 38 | Any microbial activity around windows? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 40 | Are HVAC vents clean? | Yes ☐ No ☒ | Yes ☒ No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ No ☒ | Yes ☐ No ☒ |

**\*\*Indicate Name of Bedroom/offices**

**R05** MSTR BT     **R06** BR 2 - REAR

| # | Question | R05 | R06 |
|---|----------|-----|-----|
| 38 | Any microbial activity around windows? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 40 | Are HVAC vents clean? | Yes ☒ No ☐ | Yes ☒ No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ No ☒ | Yes ☐ No ☒ |

**\*\*Indicate Name of Bedroom/offices**

**R07** UPSTAIRS STORAGE     **R08** BR 3

| # | Question | R07 | R08 |
|---|----------|-----|-----|
| 38 | Any microbial activity around windows? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 40 | Are HVAC vents clean? | Yes ☒ No ☐ | Yes ☒ No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ No ☒ | Yes ☐ No ☒ |

**\*\*Indicate Name of Bedroom/offices**

**R09**     **R10**

| # | Question | R09 | R10 |
|---|----------|-----|-----|
| 38 | Any microbial activity around windows? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ No ☐ | Yes ☐ No ☐ |

**\*\*Indicate Name of Bedroom/offices**

**R11**     **R12**

| # | Question | R11 | R12 |
|---|----------|-----|-----|
| 38 | Any microbial activity around windows? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 39 | Any water stains on ceiling/walls/carpets? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 40 | Are HVAC vents clean? | Yes ☐ No ☐ | Yes ☐ No ☐ |
| 41 | Is the paint or plaster cracking? | Yes ☐ No ☐ | Yes ☐ No ☐ |

Comments:

RO2 -38- No Window

RO2 -39- Door Frame - From Previous AC Leak + Water Heater Base. MC-5.2%
       All others - 0%

RO2 -40 Microbial Growth

RO3 - No HVAC Vent



## 52-Point Visual Inspection

## Bathroom(s)

**If more than 2 bathrooms, please describe in comment section

|  |  | Bathroom 1-MSTR | Bathroom 2 |
|---|---|---|---|
| 42 | Exhaust fan(s) present and getting proper suction? | Yes ☒ No ☐ | Yes ☒ No ☐ |
| 43 | Any leaks under the sink? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 44 | Are all bathtub seals intact? | Yes ☒ No ☐ | Yes ☒ No ☐ |
| 45 | Are there any leaks around the bathtub? | Yes ☐ No ☒ | Yes ☐ No ☒ |
| 46 | Any leaks around hot the water heater? | Yes ☐ No ☒ | Yes ☐ No ☒ |

Comments:

HALF BATH
42 N- WEAK SUCTION
43 N
44 N/A
45 N/A
46 N/A

BR2 - WTR DAMAGE/WOOD SWELLING
IN DOOR FRAME- NO CURRENT M.C

46- WATER HTR- DOWNSTAIRS STORAGE- NO ACTIVE LEAKS

## HVAC

| 47 | Is there a return vent? | Yes ☒ No ☐ |
|---|---|---|
| 48 | Is any furniture sitting on top or blocking HVAC registers? | Yes ☐ No ☒ |

Comments: (Note condition of return and ducts)

## Relative Humidity indoors

49. Readings /Comments:

DOWNSTAIRS: 42%    85.6°
UPSTAIRS    50%    78.9°

## Moisture Indoors

50. Readings /Comments:

DOWNSTAIRS WALLS 0-5.6%    UPSTAIRS WALLS
FLOORS 0-2.9%-TILE 0- LAMINATE FLOORS: TILE -0-2% CARPET-5.2-6%
CEILING 0%    CEILING:

## NEWS USA

## 52-Point Visual Inspection

Do You Recommend Remediation?   Yes ☐   No ☐   Possibly ☒

**49. Explanation:**

Some visible growth - Dependent upon Air Quality

## Issues of Concern

**50. Comments:**

Growth as indicated in report. Recommend Cleaning & monitoring

Exterior microbial growth - Left side of house - Recommend Cleaning & treating

Front Left window seal - Excessive growth

**51. Recommended Preventative Measures:**

- Exterior Downspout Extensions

## Inspector Recommends These Areas to Test

**52. *We always recommend a Tape Lift Sample for anything visual that appears to be microbial.***

Area by A/C - Exterior          AC Vent in Downstairs
Front Left Window                  Storage
Door Frame 1st Floor Storage Rm



## THE NEXT STEPS IN OUR PROCESS

1. Your lab analysis and your 52 Point Inspection will be sent to your email within 3 to 5 business days. If you expedited your results, you will receive them within 1 to 2 business days.  *Weekends and holidays are excluded. If the job was on a late Thursday, Friday or on a Saturday, results will be available on Tuesday. FedEx does not deliver our mold sample packages to the lab on weekends or on holidays.

2. You will receive a call from Newton Microbial Laboratory within 1 to 2 business days after you receive your reports to go over your lab analysis.

3. You will receive a call from Mold Test USA for recommendations and to answer any questions you may have.
   **If you are left a message, do not receive your reports during this time period or have any questions, please call Mold Test USA. We thank you for your business!**

Please call the office before sampling. Thank you!
877-554-6653 (Office Hours 9am-7pm EST, MON-FRI)
Our customer spoke with _____ at MTUSA.

**Please have Customer Initial the following:**

I agree to pay $ _____ for the inspection and testing. The inspector completed the 52 Point Inspection and I am satisfied with services rendered.

**Initial:**

## Signatures

**Inspector Signature:**

**Date:** 4/20/17

**Customer Signature:**

**Date:** 4/20/17

Would you like Mold Test USA to recommend professionals to give you estimates on needed repairs?     Yes     No

**I do not wish to have a written protocol at this time. If I choose to have protocol written at a later date and it exceeds 7 days, Mold Test USA will need to retest in order to have a properly written protocol.**

**Inspector Signature:**

**Date:** 4/20/17

**Customer Signature:**

**Date:** 4/20/17

# Mold Test USA Customer Agreement

Property Address: _____

The inspector recommends, and you agree, that the following areas be sampled:

| Location of sample | Type of Sample (circle) | # of samples in area | PRICING Base Rate: $_____ (includes 2 samples) Additional samples: $85 ea. |
|---|---|---|---|
| 1. Outdoor- Front Porch | Air/Swab/Tape/bulk material | 1 | |
| 2. Indoor - 2nd Story Hall | Air/Swab/Tape/bulk material | 1 | |
| 3. RO2- HVAC Duct | Air/Swab/Tape/bulk material | 1 | |
| 4. | Air/Swab/Tape/bulk material | | |
| 5. | Air/Swab/Tape/bulk material | | |
| 6. | Air/Swab/Tape/bulk material | | |
| 7. | Air/Swab/Tape/bulk material | | |
| 8. | Air/Swab/Tape/bulk material | | |
| 9. | Air/Swab/Tape/bulk material | | |
| 10. | Air/Swab/Tape/bulk material | | |

**The inspector suggested the following areas below to be tested in which you chose not to have tested.**

_____   **Customer Initials** _____

**EXPEDITED?   YES/ NO (circle)   Waived Fee** _____   Expedited Amount: $_____

**Total Price for services rendered:   $_____**

Payment Method: _____   **Transaction ID:** _____

THE 52 POINT INSPECTION, CUSTOMER AGREEMENT, AND RESULTS DO NOT CONSTITUTE A WARRANTY, AN INSURANCE POLICY, OR A GUARANTEE OF ANY KIND; NOR DOES IT SUBSTUTUTE FOR ANY DISCLOSURE STATEMENT AS MAY BE REQUIRED BY LAW.

Mold Test USA or the inspector is not anyway held responsible or liable for the results of the inspection and/or sampling. If you choose any form of litigation against Mold Test USA or the inspector, you hereby agree the amount of our liability will not exceed the cost of the inspection and testing. Also, if you choose to write any negative reviews or slander Mold Test USA or the inspector in anyway, we reserve the right to receive compensation for all damages incurred.

Mold Test USA only performs mold inspections and sampling. We do not write Protocol, nor do we perform remediation work.

Confidentiality: The inspection and testing is done for your benefit and use. The results analyst, a biologist from Newton Microbial Laboratory, will be calling you to go over the results with you and give you recommendations for your next step. If cleaning, removal or remediation is needed, Mold Test USA may be able to refer you to a certified, licensed and insured remediation company that follows proper protocol. All remediation companies are independent from Mold Test USA and does not reflect on Mold Test USA. By initialing here, this allows Mold Test USA to release your results and information for you to have a free estimate for services suggested to no more than three companies.   **Customer Initials** _____

Applicable Law. This Agreement, its validity, enforceability and the construction and interpretation of its terms and provisions shall all be in accordance with the applicable laws of the State of South Carolina. No claim, demand, action, proceeding, arbitration, litigation, hearing, motion or lawsuit arising here from or with respect to the rights and obligations created hereunder shall not be commenced or prosecuted in any jurisdiction other than the State of Carolina. The parties hereto hereby consent and stipulate to the jurisdiction of the Circuit and County Courts of Richland County, South Carolina.

By signing below, you acknowledge that you have read, understand, and agree to the terms and conditions of this agreement, including (but not limited to) the limitations of liability, arbitration clause and limitation period, and agree to pay the fee listed in the box above.

| K Pa | 4/20/17 | | 4/20/17 |
|---|---|---|---|
| **Customer's Signature** | **Date** | **Inspector's Signature** | **Date** |

**877-554-6653** admin@moldtestusa.com   **Mon-Fri 9am-7pm EST**

Newton
Laboratory

# NML-20170424-Rushing and Guice - 295 Fairchild Dr

**Spore Analysis Completed for**



1101 1st Street South EXT. Suite B, Columbia, SC 29209
800-778-0582
admin@moldtestusa.com

| | |
|---|---|
| Collected Date | 4/20/2017 |
| Collected Street Address | 226 Fairchild Dr |
| Collected & Relinquished by | Ed Williams |
| # of Sample Sent | 3 |
| # of Sample Received & Accepted | 3 |
| Sample(S) Received & Accepted on | 04/24/2017 |
| Sample(S) Received & Accepted by | Janna Komorowski |
| Sample(S) Analyzed on | 04/24/2017 |
| Sample(S) Analyzed by | Janna Komorowski |
| Report Approved by | Crystal Hernandez |
| Report/Test Type | Standard |

Thank you for using Newton Microbial Laboratory for your microbial analysis. Currently there are no Federal regulations for fungal contamination or remediation. This document was designed to follow current industry guidelines for the interpretation of microbial sampling, analysis, and remediation. Newton Microbial Laboratory bears no responsibility for sample collection, analytical method(s), or the use of test results. All samples listed on this report were received in acceptable condition unless otherwise stated. The client is solely responsible for the use or interpretation. The results in this analysis pertain to only this analyst on the stated date collected and should not be used in the interpretation of any other job. Due to the subjective nature of fungal analysis, Newton Microbial Laboratory makes no express or implied warranties as to the health or the tested property. Newton Microbial Laboratory reserves the right to properly dispose of all samples after the testing of the samples are completed. Newton Microbial Laboratory or its employees are not liable for incidental or consequential damages arising out of the use of these test results.

**Spore Analysis Completed by**

Newton
Laboratory

1101 1st Street South EXT Suite C, Columbia SC 29209

**Janna Komorowski**
Laboratory Director, B.A. in Biological Sciences

**Crystal Hernandez**
Operations Director, B.A. in Biology

EXHIBIT
C

Newton Fungal Assessment Report V2016t1.2
©2013-2017 Newton Microbial Laboratory

# Newton Microbial Laboratory

| Field | Left Sample | Right Sample |
|---|---|---|
| Property/Customer Name | Rushing and Guice - 295 Fairchild Dr | |
| Company Email | administrator@... | |
| Site Street Address | | 226 Fairchild Dr |
| Company Phone Number | | 803-776-0562 |
| Company Address | 1101 1st Street South EXT, Suite B, Columbia, SC 29209 | |
| Company Name | | Mold TEST USA |
| Newton ML Sample ID | CAE20170424012S001AS | CAE20170424012S002AS |
| Sample Name/Location | Outside Off Front Porch | 2nd Story Hall |
| Volume (L) | 150 | 150 |
| Background | 3 | 3 |
| Analyt. Sensitivity 100X (cts/M³) | 7 | 7 |
| Analyt. Sensitivity 400X (cts/M³) | 13* | 13* |
| Sample Type | Spore Trap | Spore Trap |

| Site City | Biloxi | Site State | MS | Site Zip | 39531 |
|---|---|---|---|---|---|
| Date Collected | 4/20/2017 | Date Received | 04/24/2017 | | |
| Sample Collected by | Ed Williams | Date Analyzed | 04/24/2017 | | |

| Organism | Counted | Cts/M³ | % of Total | Counted | Cts/M³ | % of Total |
|---|---|---|---|---|---|---|
| Alternaria | 3 | 20 | 2.53% | Not Detected | | |
| Ascospores | Not Detected | | | 6 | 40 | 5.20% |
| Aspergillus/Penicillium* | 49 | 627 | 79.38% | 38 | 486 | 63.13% |
| Basidiospores | Not Detected | | | 4 | 27 | 3.46% |
| Bipolaris/Drechslera* | 1 | 7 | 0.84% | 4 | 27 | 3.46% |
| Chaetomium* | Not Detected | | | Not Detected | | |
| Cladosporium* | 7 | 90 | 11.34% | 6 | 77 | 9.98% |
| Curvularia | Not Detected | | | Not Detected | | |
| Epicoccum | 1 | 7 | 0.84% | Not Detected | | |
| Fusarium* | Not Detected | | | Not Detected | | |
| Memnoniella* | Not Detected | | | Not Detected | | |
| Myxomycetes) Smuts | 3 | 20 | 2.53% | 5 | 33 | 4.33% |
| Pithomyces | 1 | 7 | 0.84% | Not Detected | | |
| Stachybotrys* | Not Detected | | | Not Detected | | |
| Stemphylium | Not Detected | | | Not Detected | | |
| Torula | Not Detected | | | Not Detected | | |
| Trichoderma* | Not Detected | | | Not Detected | | |
| Ulocladium | Not Detected | | | Not Detected | | |
| Unspecified Spore | 2 | 13 | 1.69% | 12 | 80 | 10.39% |
| Total | 67 | 790 | 100.00% | 75 | 770 | 100.00% |

| | Counted | Cts/M³ | | Counted | Cts/M³ | |
|---|---|---|---|---|---|---|
| Hyphal Fragment | 3 | 20 | | Not Detected | | |
| Spore Trap+ Dander* | na | | | na | | |
| Fiber* | na | | | na | | |
| Pollen* | na | | | na | | |

Color Code   Common Outdoor   Common Indoor   Water Damage Indicator

Comments

Newton
Laboratory

Newton Report ID
20170424 Rushing and Guice - 226 Fairchild Dr.xlsm



Legend: Outside Off Front Porch · 2nd Story Hall

X-axis values: 0, 100, 200, 300, 400, 500, 600, 700

Categories (Y-axis):
- Alternaria
- Ascospores
- Aspergillus | Penicillium *
- Basidiospores
- Bipolaris | Drechslera
- Chaetomium
- Cladosporium *
- Curvularia
- Epicoccum
- Fusarium *
- Memnoniella *
- Myxomycetes | Smuts
- Pithomyces
- Stachybotrys
- Stemphylium
- Torula
- Trichoderma *
- Ulocladium
- Unspecified Spore

Newton Fungal Assessment Report V2016.11.2
©2013-2017 Newton Microbial Laboratory



# Spore Trap Analysis Explanation

**Volume**  Flow Rate * Flow Rate Minute

**Background**  None: Recollect

1: <5%

2: 5% ≤ Background Coverage < 25%

3: 25% ≤ Background Coverage < 70%

4: 70% ≤ Background Coverage < 90%

5: 90% ≤ Background Coverage < 100%, Recollect

**Cts/M³**  Spore Counts per Cubic Meter

**Hyphal Fragment**  Fragments of hyphae. Can be an additional indicator of possible mold presences

**Unspecified Spore**  Less commonly identified spore types, other than those listed on the report

**Limit of Detection**  1 spore count per coverage examined area

**Sample Type**

Spore Count  Spore Trap Cassettes   Identification & Enumeration of Fungal Spores

Spore Count+  Spore Trap Cassettes   Identification & Enumeration of Fungal Spores
+ Total Dander, Fiber, and Pollen Count

**Spore Trap Analytical Report Method**
NML-SAM-1611, adapted from ASTM D7391-9

* Uncertainty available upon request

**Newton Microbial Laboratory**

Newton Report ID
20170424 Rushing and Guice - 226 Fairchild Dr.xlsm

| | | |
|---|---|---|
| Site Name | Rushing and Guice - 295 Fairchild Dr | Site Address  Site Address  226 Fairchild Dr | Site City  Biloxi | Site State  MS | Site Zip  39531 |

Company Email: admin@moldtestusa.com
Company Phone Number: 803-776-0562
Company Name / Company Name: Mold TEST USA
Date Collected: 4/20/2017
Date Received: 04/24/2017
Sample Collected by: Ed Williams
Date Reported: 04/24/2017

Company Address: 1101 1st Street South EXT. Suite B, Columbia, SC 29209

Newton ML Sample ID: CAE201704240125001TS
Sample Name / Location: RO2 (Downstairs Storage) AC Vent
Sample Type: Direct ID - Tape

| Organism | Category | Trace 1-10 | Light 11-300 | Med 301-1000 | High 1001+ |
|---|---|---|---|---|---|
| Alternaria | ND | | | | |
| Ascospores | ND | | | | |
| Aspergillus\|Penicillium | ND | | | | |
| Basidiospores | Light | | | | |
| Bipolaris\|Drechslera | ND | | | | |
| Chaetomium | ND | | | | |
| Cladosporium | ND | | | | |
| Curvularia | ND | | | | |
| Epicoccum | ND | | | | |
| Fusarium | ND | | | | |
| Memnoniella | ND | | | | |
| Myxomycetes\|Smuts | Trace | | | | |
| Pithomyces | ND | | | | |
| Stachybotrys | ND | | | | |
| Stemphylium | ND | | | | |
| Torula | ND | | | | |
| Trichoderma | ND | | | | |
| Ulocladium | ND | | | | |
| Unspecified Spore | Trace | | | | |

ND = Not Detected

| | | | | |
|---|---|---|---|---|
| Hyphal Fragment | Light | | | |
| Background Debris | Moderate | | | |

| | | | |
|---|---|---|---|
| Comments | | | |

| Color Code | Common Outdoor | Common Indoor | Water Damage Indicator | Color Code |
|---|---|---|---|---|



# Direct Identification Explanation

**Direct ID**

| | |
|---|---|
| Trace | Spore Count less than 10 |
| Light | Estimated Spore Counts between 11 and 100 |
| Medium | Estimated Spore Counts between 101 and 1000 |
| High | Estimated Spore Counts above 1000 |

**Hyphal Fragment/Background Debris**

| | |
|---|---|
| Not Detected | Not Found in the Sample |
| Light | Found Traces throughout the Sample |
| Moderate | Found Some throughout the Sample |
| Heavy | Found All throughtout the Sample |

**Unspecified Spore**    Less commonly identified spore types, other than those listed on the report

**Sample Type**

| | |
|---|---|
| Direct ID-Swab | Swab for ID only | ID and Semi-Quantitative Enumeration of Spores |
| Direct ID-Swab+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Direct ID-Tape | Swab for ID only | ID and Semi-Quantitative Enumeration of Spores |
| Direct ID-Tape+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |
| Direct ID-Bulk | Swab for ID only | ID and Semi-Quantitative Enumeration of Spores |
| Direct ID-Bulk+ | Swab for ID + Spore Count | ID and Enumeration with Spore Count |

**Direct Analytical Report Method**

NML-SAM-1611

Newton
Microbial
Laboratory

# Alternaria







## Growth & Distribution

- Alternaria is one of the most common and widely distributed molds on the planet (2). The reproductive spores become airborne easily and are prolific in the atmosphere worldwide.

- **Growth Rate:** Rapid Mature with 0.5 to 8 days (34)

- **Water activity:** 0.85–0.88 (1)

- **Outdoors:** In the outdoor environment, Alternaria is found in soil, water and plant material- it plays an important role in vegetable matter decomposition (1) . Airborne Alternaria spore counts are often higher around farming and agricultural operations, particularly during harvesting processes when spores are released into the air in large numbers. (3) It is well studied as a plant pathogen having saprophytic effects on a wide variety of vegetation and is often the source of early blights in crops (2). It reaches peak concentrations during late summer and fall (2).

- **Indoors:** Alternaria can be found growing indoors on textiles, dust, wood, carpeting, flooring, drywall or gypsum board, wall paper, furniture, and other cellulose materials. It can be found in humidifiers, heating and air conditioning units, inside of ductwork, and surrounding damp areas i.e. sinks, showers, and windows(1).

## Health Effects

- **Allergenic**

  - Considered by some to be among the most common mold allergens in the US (1).
  - Alternaria can cause allergy symptoms following ingestion, inhalation, injection or direct contact.
  - Alternaria spores are airborne allergens (1). Reactions due to inhalation may increase during peak concentration times in late summer and early fall.
  - Inhalation of high concentrations by sensitive individuals may manifest in Type I and Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling).
    urticarial (hives) or hypersensitivity pneumonitis (Type III).

- **Pathogen**

  - Invasion is rare but can occur, particularly in immunocompromised individuals. Cases of onychomycosis (nail infection), sinusitis, ulcerated cutaneous infections, keratitis, phaeohyphomycosis, as well as osteomyelitis and peritonitis in patients undergoing peritoneal dialysis have been reported (1,4).
  - Can occasionally cause phaeohyphomycosis (fungal infection), usually in subcutaneous tissue (6).

## Toxins/Metabolites

  - Alternariol (antifungal uses), AME (alternariol monomethylether), tenuazonic acid, & altertoxins (1)

  •Outside Off Front Porch • • • • • • • • • • • • •                                                      [list of references can be found in http://newtonlaboratory.com/glossary]

Found in Samples)
AIR
DIRECT      • • • • • • • • • • • • • • •



Newton
Microbial
Laboratory



# Ascospores

## Growth and Distribution

Ascospores refers to spores produced in a sac-like structure known as an ascus (plural asci). These spores are specific to fungi of the phylum Ascomycota. Ascomycota is a broad division containing a large number of genera and individual species. Identification of the genus and/or species based on spore morphology alone is not always possible, therefore these spores are often given the more general classification of "Ascospores" in microscopic analysis.



– Ascospores are found worldwide with prevalence and distribution depending on particular genus and species.

– **Outdoors:** Ascospores are found ubiquitously in outdoor environments; often found on dead and decaying plant material. Many types are known to have pathogenic or parasitic properties in plants.

– **Indoors:** Common substrates include damp building materials such as gypsum or lumber, carpeting, dust, and other organic materials.

## Health Effects

– **Allergen**

- Ascospores can be allergenic to sensitive individuals, most often producing Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis (Type III). (5)

  Reactions due to spore inhalation may increase following rain or high humidity. (5)

- Unlike some fungi which rely on air currents for spore dispersal, ascomycetes are capable of a more active form of spore dispersal that utilizes water droplets to catapult their spores into the air. Various species of Ascospores are known to use this method to liberate spores every single day, regardless of air flow. Subsequently, exposure to ascospores may be more consistent from day to day than exposure to other spores which are only dispersed with adequate air currents. For this reason these spores may be of particular interest in cases of chronic respiratory disease such as asthma and rhinitis (5).

– **Pathogen**

- Some types can be pathogenic; dependent upon genus and species.

– **Toxins\Metabolites**

- Vary greatly depending on genus and species.

( List of references can be found at: http://newtonlaboratory.com/glossary

Found in Sample(s)
AIR              ••2nd Story Hall••••••••••••
DIRECT         •••••••••••••••••

# Aspergillus/Penicillium



**Growth & Distribution (7):**

- Aspergillus & Penicillium are incredibly adaptive and abundant organisms. Their distribution is world-wide with many species possessing abilities to tolerate environmental conditions that challenge other molds (i.e. extreme temperatures & pH levels, restricted water availability and exposure to radiation). Colony growth rates are rapid for many species. Mature colonies are capable of quickly producing large numbers of spores. Because of the morphological similarity of the spores, the two genera are typically grouped together as "Aspergillus-Penicillium."
- **Growth Rate:** Usually Rapid – Mature within 3-4 days; however, some species are slower(6).
- **Water Activity:** Aspergillus: 0.93-0.97 & Penicillium: 0.88 – 0.99 (33, 35)
- **Outdoors:** Both can be found outdoors on a variety of substrates- particularly plant materials such as cereals, grains, decaying wood, and soil(7).
- **Indoors:** Found indoors on organic materials such as wood, textiles, cellulose materials, carpeting, painted surfaces, and food stuffs such as cheeses, butter/margarine meats, breads, fruits and vegetables. Halotolerant species may be found growing on refrigerated foods (7). Penicillium is used in cheese production and is responsible for the veins in blue cheese.

**Health Effects**

- **Allergen:**

  - Because these spores are so abundant, daily exposure to Aspergillus/Penicillium is very common in both indoor and outdoor environments. Often this exposure occurs without any noticeable reaction or symptoms. However, sensitivities may develop in some instances- especially with prolonged exposure to high spore concentrations. This can result in allergic responses.
  - Spores may progress further into the respiratory system than other common spores due to their small aerodynamic diameter.
  - Penicillium is the mold from which the antibiotic Penicillin was first derived. Penicillin is now made synthetically. It does not contain the mold Penicillium. Allergy to one does not necessarily imply allergy to the other.

- **Pathogen (6,7):**

  - There are approximately 175 species of Aspergillus, only about 20 of which are known to cause disease in humans.
  - Diseases caused by Aspergillus are known as aspergillosis and include invasive infection, colonization, & toxicosis.
  - Certain species of Penicillium are considered pathogens. Infection may occur in skin, blood, bone marrow, internal organs or lymph nodes. (6). In the immunocompromised (particularly HIV patients or those who have recently been in Southeast Asia) *P. marneffei* can cause severe infection capable of affecting respiratory, lymphatic, and nervous systems.

- **Toxins/Metabolites:**

  - Different species of Aspergillus/Penicillium are associate with an array of mycotoxins and metabolites, some of which are medically significant in humans. The importance of these toxins can vary from species to species and depends largely on the prevalence of that species.

**AIR** ⋯·Outside Off Front Porch·2nd Story Hall**············**

**DIRECT** **···············**

(1) List of references can be found at: http://newtonlaboratory.com/glossary

Newton Report ID
20170424 Kushing and Guice - 226 Fairchild Division

Page 10 of 15





# Basidiospores

## Growth & Distribution:

- Basidiospores are spores produced by the division of Fungi known as Basidiomycota. These spores are unique for lacking septation, containing bilateral symmetry, and often having a visible pore at the site of detachment from the basidium (7). This is a large group of organisms consisting of a large number of individual genera & species. Distribution is world-wide with the prevalence in any given area varying for each genus and species. Like ascospores, basidiospores disperse using water droplets. Therefore, airborne spore concentrations are often higher following rain or high humidity. This division includes edible mushrooms.

- **Outdoors:** Basidiospores are found growing on plant material, organic debris, and soil. Many species of basidiospores are known to be plant pathogens.

- **Indoors:** Basidiospores may be found growing on damp materials. Colonies may grow given sufficient access to water (leaks, flooding, high humidity, or surrounding plumbing, heating/air conditioning components, appliances, house plants, etc.).

## Health Effects:

- **Allergenic:**

  - Exposure to these spores is commonplace in both indoor and outdoor environments. Nonetheless they are also potentially allergenic. Allergic responses may occur following inhalation, ingestion, or direct contact. Reactions due to inhalation may be increased following rain or high humidity when spore concentrations are often elevated.

  - In sensitive individuals, typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogenic:**

  - Invasion is not typical but can occur, particularly in the immunocompromised or immunosuppressed. These infections can includes sinitus, keratitis, phaeohyphomycosis, & peritontist.

- **Toxins\Metabolites:**

  - Mycotoxins vary depending on genus and species. They are especially relevant in edible fungi of this division such as mushrooms.

    - Common sources of mushroom poisoning include *Amnita, Lepiota, Coprinus, & Psilocybe*

(1 List of references can be found at: http://newtonlaboratory.com/glossary

Found in Sample(s)
AIR           ••2nd Story Hall••••••••••••
DIRECT     •RO2 (Downstairs Storage) AC Vent••••••••••••••••



Newton
Laboratory



Newton
Microbial
Laboratory



# Bipolaris/Drechslera

## Growth & Distribution:

- Bipolaris, Drechslera, Exserohilum, & Helminthosporium are dematiaceous fungi, producing spores which are elongate, cylindrical, often with numerous septations or cells. These genera are grouped together due to spore similarity. These spores are common in both indoor and outdoor environments. They are found world wide with some species being exceptionally tolerant of dry environments (6).

- Growth Rate: Rapid – Mature within 5 days (6)

- Water Activity: 0.80 (this is a generalized number for common molds) (26)

- Outdoors: These molds are most commonly found on grasses, grains and other plant materials. Bipolaris can be a plant pathogen causing spots, blights, rots, and other symptoms in staple crops like rice, wheat, and sorghum. In the past, plant disease caused by Bipolaris invasion has caused starvation of large human populations. In 1943-1944 the Bengal famine in India was caused by *Bipolaris oryzae* disease in rice. In the 1970s, *Bipolaris maydis* was responsible for a devastating leaf blight resulting in huge losses of corn crops in the USA & UK. (11)

- Indoors: These mold may be found on water damaged materials, food stuffs, houseplants, and other organic materials.

## Health Effects:

- ### Allergenic:
  - These molds are highly common in both indoor and outdoor environments; most people have some level of exposure on a daily basis.
  - In sensitive individuals can manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- ### Pathogenic:
  - Bipolaris (rapid growth – mature within 5 days) can be pathogenic in rare instances, particularly in immunocompromised. May invade bone, cornea (keratomycosis), skin, aorta, lung, central nervous system or cause brain lesions (6).
  - Exserohilum (rapid growth – mature within 5 days) can cause phaeohyphomycosis (infection of mycelia/hyphae of dematiaceous fungi), most commonly in nasal sinuses, skin, subcutaneous tissue, and cornea. Rare reports of fatal disseminated infection (6).

- ### Mycotoxins/Metabolites:
  - Cytochalasin, sporidesmin, sterigmatocystin (7)



\*Outside Off Front Porch-2nd Story Hall\*\*\*\*\*\*\*\*\*\*
AIR
DIRECT
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

(A List of References can be found at http://newtonlaboratory.com/glossary

Newton
Laboratory



# Cladosporium

**Growth & Distribution:**

- Cladosporium are found in air and soil worldwide. Cladosporium are among the most common airborne fungi (4). Spores are produced in abundance and easily disperse through the air. Extremely common on decaying organic matter. These mold are common plant pathogens. Molds of this genus are dematiaceous with over 40 named species (1).

- **Growth Rate:** Moderately Rapid – Mature within 7 days. (6)

- **Water Activity:** 0.85-0.88 (1)

- **Outdoors:** Cladosporium can be found on food sources such as cereals, fruit, vegetables. Commonly found on dead plants and shrubs in temperate regions. Halotolerant (salt tolerant) species exist. (7) The most common species isolated from plant materials & soils (C. cladosporioides) experiences peak airborne spore concentrations between June/July and September/October in temperate climates (2).

- **Indoors:** Cladosporium can be found on water damaged materials (i.e. plaster, paint, textiles, gypsum, wall paper, wood, moist window sills). May affect food sources such as cheeses, butter/margarine, vegetables, fruits and vegetables(7). Often found on the surface of fiberglass duct liners, in bathroom showers, and on basement walls (2). Some studies have reported Cladosporium in 70% of homes examined in the US & 100% of homes examined in Canada (1).

**Health Effects:**

- **Allergen:**
  - Allergic reaction to airborne spores are of particular importance because these spores exist in in such high concentrations in the air. Symptoms may increase during peak concentrations from June-October. Sensitization may occur. (1)
  - In sensitive individuals typically manifest Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**
  - Is pathogenic in humans very rarely, reported cases include skin lesions, keratitis, onychomycosis, sinusitis, pulmonary infections (1).

- **Mycotoxins/Metabolites:**
  - Cladosporic acid (12)
  - Gibberellin (hormone influencing developmental processes in plants) & ergosterol (precursor to vitamin D2 which may have anti-tumor properties). (1)
  - Toxic effects have been seen in animals (chicken embryos & horses) but not known to be reported in humans to date (1,2).

(1) List of references can be found at: http://newtonlaboratory.com/glossary



Found in Sample(s)
AIR           :»Outside Off Front Porch«2nd Story Hall»»»»»»»»»»»
DIRECT    »»»»»»»»»»»»»»»»»



Newton
Microbial
Laboratory



# Epicoccum



**Growth & Distribution**

– Epicoccum is found worldwide. Spores are large with distinctive, highly septate morphology and dark brown color (7). Spores are dispersed easily by the wind. Airborne concentrations are generally higher on dry, windy days with higher counts occurring later in the day (1). Spores are common in both outdoor and indoor air.

- **Growth Rate:** Moderately Rapid – Mature within 7 days (6)
- **Water Activity:** 0.86-0.90 (1)
- **Outdoors:** Epicoccum is most often found on aging or decaying plants. It is known to invade various parts of dead plants such as the seeds of corn, barley, oats, & wheat as wells as beans and surrounding soil. Can also invade insects. (7)
- **Indoors:** Found on cellulose materials (e.g. gypsum boards, floors, paper, woods, cardboard) and other organic materials (e.g. house plants, dust, and occasionally human skin and sputum(7)).

**Health Effects:**

– **Allergen:**
  - Believed to be an important spore in inducing fungi-related respiratory allergy disorders. Increases in outdoor spore concentrations may exacerbate asthma attacks in children.(1)
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

– **Pathogen:**
  - Not believed to be infectious in humans (1).
    - 1 reported case of fatal haematogenous mycosis in a severely immunosuppressed allogeneic hematopoietic stem cell transplant recipient possibly attributed to Epicoccum (1).

– **Toxins/Metabolites:**
  - No toxins or metabolite reported to be harmful to humans.
  - Produces secondary metabolites and mycotoxins which may be useful as biocontrol agents against bacteria, fungi, & viruses (1).
    - E.g. *E nigrum* against *Monilinia* spp. on fruit (7).

(List of references can be found at: http://newtonlaboratory.com/glossary

Found in Sample(s)
AIR          •Outside Off Front Porch•••••••••••
DIRECT       •••••••••••••••••



# Myxomycetes



**Growth & Distribution**

- Myxomycetes is a large class with approximately 500 individual species and worldwide distribution (25). Interestingly, these organisms are no longer considered to be true fungi like other molds, but have been reclassified as protozoans. These organisms belong to group commonly called "slime molds" that exhibit an amoeba-like stage. Spores are common in both indoor and outdoor environments worldwide (15). Spores can be dispersed by air, arthropods and other animals due to their small size (4 – 20 μm)(25).

- **Growth Rate:** Generally Rapid – Mature within 2 to 4 day; however, specific growth rate does depend on species (24).

- **Water Activity:** 0.80 (this is a generalized number for common molds)(26).

- **Outdoors**

  - Found in soil, decaying plant material (especially damp wood), and dung. Species of Myxomycetes are not as geographically constricted as most organisms; most Myxomycetes species can be found world wide. (15)

- **Indoors**

  - Can be found growing indoors on damp building materials such as cardboard, wallpaper, gypsum board, wood, etc.

**Health Effects:**

- **Allergen:**

  - These spores are very common in both indoor and outdoor air. They are small, foreign particles which may be inhaled deep into the respiratory system and may cause allergic responses.

  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)

- **Pathogen:**

  - Unknown

- **Toxins/Metabolites:**

  - Unknown

(List of references can be found at http://newtonlaboratory.com/glossary

Found in Sample(s)
AIR        •Outside Off Front Porch•2nd Story Hall•••••••••••••
Direct     •RO2 (Downstairs Storage) AC Vent••••••••••••••••••

# Phoma



## Growth & Distribution:

The colonies grow fairly fast, usually dark (grey to black) in color, while occasionally being yellowish white in color, suede- like to downy, with multicellular conidia (phragmo- or dictyoconidia) forming on peg- like extensions. The conidia extensions are oblong, segmented, verrucose and light brown in color. (4, 29) These spores can be distributed by light winds, rain, and by grazing sheep (27).

- **Growth Rate:** Rapid – Mature within 5 days (6)
- **Water Activity:** 0.80 – 0.89 (28)
- **Outdoors**
  - Can be found on soil and litter (4). During sheep grazing can be found on herbage due to dry litter. (27)
- **Indoors**
  - Can be found on paper (30).

## Health Effects:

- **Allergen:**
  - In sensitive individuals, typically manifests Type I or Type III hypersensitivity reactions. These include allergic asthma, conjunctivitis (redness of the eye), rhinitis (hay fever), anaphylaxis, angioedema (dermal swelling), urticarial (hives) or hypersensitivity pneumonitis & allergic sinusitis (Type III). (5)
- **Pathogen:**
  - Can very rarely cause infection in the immunocompromised (6).
  - Can cause onychomycosis (29).
  - One case of peritonitis reported in a patient with vulvar cancer. (29)
- **Toxins/Metabolites:**
  - Sporidesmin (a mycotoxin which causes facial eczema in sheep)(31).



Found in sample
AIR             •Outside Off Front Porch•••••••••••••
DIRECT      •••••••••••••••••

(¹ List of references can be found at http://newtonlaboratory.com/glossary)

